[Crim. No. 1196. In Bank.—June 28, 1905.]

## THE PEOPLE, Respondent, v. FRANK WOODS, Appellant.

CRIMINAL LAW — MURDER — EVIDENCE — CONSPIRACY FOR BURGLARY — ARMING—POSSESSION OF IMPLEMENTS—MOTIVE.—Where the evidence showed that appellant fired the fatal shot which killed a policeman while in the line of his duty, and that he was one of a party of burglars who had armed themselves with loaded pistols and had in their possession burglars' tools and dynamite, and were returning from an unsuccessful attempt at burglary at the time of the murder, evidence of the preceding circumstances and of such arming and possession of burglarious implements was admissible as tending to show the motive and probable line of conduct of the appellant at the time of the killing and also to show a common design to resist arrest by use of the loaded pistols.

ID.—HARMLESS EVIDENCE.—Evidence as to irrelevant incidents connected with the burglarious trip and of proposals to which the appellant was not a party was harmless.

ID.—RES GESTÆ—ATTEMPT AT ROBBERY BY CO-DEFENDANTS—OUTCRY— INTERFERENCE BY OFFICER KILLED.—Evidence to show an attempt by co-defendants who belonged to the party to rob a person on the return trip, and of his outcry and their flight, and the interference of the police officer which led to his death, was admissible as being of the *res gestæ.*

ID.—EVIDENCE OF CO-DEFENDANT—CORROBORATION—SUPPORT OF VERDICT.—Where the evidence of a co-defendant as to the murder by appellant was sufficiently corroborated, and if the conspiracy was then to be considered at an end, his testimony as to defendant's guilt,

and that he had no part in it by design or act, was sufficient to authorize a conviction; if the jury believed his testimony, their verdict of guilty is sufficiently supported.

ID.—DELIBERATE PURPOSE TO KILL—SUFFICIENCY OF EVIDENCE—MURDER IN FIRST DEGREE.—Evidence showing that the appellant made preparations to kill in connection with the projected burglary, and that when an officer approached under circumstances indicating a probability that he would arrest or search him he killed the officer, is sufficient to show a deliberate purpose to kill, and to warrant conviction of murder in the first degree.

ID.—MISCONDUCT OF DISTRICT ATTORNEY—INADVERTENT ALLUSION TO ALIAS NAME.—Where the appellant was named with an *alias* in the indictment, and the court upon refusing a motion of defendant to strike it out had instructed the clerk not to read the *alias* name to the jury, an inadvertent allusion by the assistant district attorney to the *alias* name during impanelment of the jury, for which apology was made as soon as defendant's counsel objected, where there is nothing to show that such assistant knew of the direction given to the clerk, is not such misconduct as to require a new trial.

ID. — INSTRUCTIONS — DEGREES OF MURDER — FORM OF VERDICT AS TO PENALTY.—It was not error for the court in its charge to include the statutory definition of murder in the first degree, and to give a clear definition of murder in the second degree, and to instruct the jury as to the form of their verdict if they found the defendant guilty of murder in the first degree in fixing the punishment.

ID.—OMISSION OF OTHER FORMS—REFUSAL OF REQUEST—ABSENCE OF EXCEPTION.—The omission of the court to give the form of verdict of murder in the second degree cannot be regarded as an intimation that such a verdict was out of the question; and the refusal of the court to give requested forms of verdict for murder in the second degree and for manslaughter, to which no exception was taken, cannot be considered upon appeal.

APPEAL from a judgment of the Superior Court of the City and County of San Francisco and from an order denying a new trial. Carroll Cook, Judge.

The facts are stated in the opinion of the court.

Albert P. Wheelan, for Appellant.

U. S. Webb, Attorney-General, and J. C. Daly, Deputy Attorney-General, for Respondent.

BEATTY, C. J.—The appellant, jointly with five others, was indicted for the murder of Eugene C. Robinson, a police

officer of San Francisco. Upon a separate trial he was con-
victed of murder of the first degree and sentenced to death.
His appeal is from the judgment and from an order denying
his motion for a new trial.

The principal direct evidence against the appellant was the
testimony of William Henderson, one of the six defendants
charged with the murder, who stated that he, Goucher, Kauff-
man, Kennedy, Courtney, and the appellant had formed a
plan to rob the safe at Cypress Lawn Cemetery; that they
had provided themselves with burglars' tools, dynamite, etc.,
for the purpose of breaking into the safe, and on the night
of the 20th of January, 1902, had gone to Cypress Lawn,
where, finding the place occupied and guarded, they had
abandoned the enterprise and started back to the city about
midnight. All but one of the party were armed with pistols,
that of appellant being of .44 caliber, the others smaller. Hen-
derson, the witness, was carrying the tools and dynamite. In
returning to the city they rode on electric cars to a point near
the junction of Mission and Valencia streets, where the last
car was put in the barn, and from there they started to walk
down into the city. They divided themselves into two parties,
Woods, Henderson, and Kauffman going in front, and Ken-
nedy, Goucher, and Courtney following at some distance
behind. While proceeding in this way, those in front were
called back by those behind to consider a proposition to break
into the office of a coal-yard and rob it. This enterprise was
vetoed by Woods, Kauffman, and Henderson, and their tramp
to the city was resumed in the same order as before. When
the three who were in advance got to Seventeenth Street, on
Valencia, they heard a loud yell of alarm coming from the
direction of Eighteenth and Valencia streets, and directly
Goucher and Kennedy came running up. Kennedy turned
and fired a shot from his pistol in the direction from which
they had come, jumped over a fence, and disappeared.
Goucher joined those in front, remarking that he was not
going to run. When the four had proceeded to a point be-
tween Sixteenth and Seventeenth streets on Valencia, the
deceased, in plain clothes, ran up behind them and asked
"Who has got that gun?" Henderson, the witness, started
to get away, and had gone about twenty-five feet when two
shots rang out, and were shortly followed by a whole fusillade.

Henderson continued his retreat, and only saw, or thought he saw, as he was leaving, that the appellant and Goucher were shooting the man who ran up—officer Robinson. He also heard the command, "Throw up your hands," and thought it was the voice of appellant. He continued running along Valencia to Sixteenth Street, down Sixteenth Street to Julian Avenue, and along Julian Avenue to Fifteenth Street. In his flight he was followed closely by Goucher and appellant, and he heard the latter say to Goucher as they ran, "He got me twice." At the corner of Julian Avenue and Sixteenth Street some one came up and commanded them to stop, but they continued to retreat, and some shooting occurred as they were passing along Julian Avenue from Sixteenth to Fifteenth streets. One shot struck the witness as he was retreating, and he fired three shots in return. At Fifteenth Street he was overtaken and arrested by officer Taylor.

The testimony of this witness was supplemented by ample proof that officer Robinson was shot and killed at the spot on Valencia Street, between Sixteenth and Seventeenth, where the fusillade occurred, and it was corroborated in almost every detail by the testimony of other witnesses and by circumstantial evidence of a very persuasive character. Officer Taylor was at the corner of Mission and Fifteenth streets when he heard the shooting on Valencia. He ran to Sixteeth and up Sixteenth to the corner of Julian Avenue in time to encounter Goucher and appellant, whom he ordered to halt, stating that he was an officer. They continued to run along Julian Avenue, as related by Henderson, and some one fired at the officer. He drew his pistol and fired at them. One of his shots would account for the wound received by Henderson at this point. The appellant, when subsequently arrested, was found to be wounded in two places, but his wounds were probably inflicted by officer Robinson, for officer Taylor noticed that he was limping when he turned into Julian Avenue, and he saw his companion (Goucher) take him by the arm, saying at the same time, "Come on, you son of a bitch," and Henderson heard him say just before that, "He [meaning officer Robinson] got me twice." Officer Taylor at the trial positively identified appellant as the larger of the two men he encountered at the corner of Julian Avenue

and Sixteenth Street, and the one who had the heavier-sounding pistol. Two overcoats resembling those worn by appellant and Goucher previous to the shooting were found the next morning in a vacant lot near by, and one of them had bulletholes corresponding to the wounds found on appellant's body when he was arrested some weeks after the murder at Portland, Oregon. The fatal wounds received by officer Robinson were caused by .44-caliber bullets, and two witnesses testified that a few days before the murder a man resembling appellant and wearing an overcoat like that found with the bulletholes in it had been inquiring at their shops for short .44 cartridges.

A number of other circumstances corroborative of Henderson's statement were proved. Appellant was identified as a visitor at the place where three of his co-defendants lived. The conductors and gripmen on three or four different electric cars remembered the party of six men who went out to Cypress Lawn on the 20th of January and returned shortly after midnight to the car-barn near the junction of Mission and Valencia streets and started to walk from that point along Valencia Street to the city. They did not positively identify appellant as one of the party, but, aside from the testimony of officer Taylor as to his identity with the man he encountered at the corner of Julian Avenue and Sixteenth Street, the circumstances proved—especially the correspondence of the wounds on his body with the bullet-holes in the overcoat found near the spot where he eluded officer Taylor— were sufficient to justify the jury in concluding that appellant was the man who was hit twice by officer Robinson in the encounter on Valencia Street. In short, there was evidence sufficient to warrant the jury in finding that the six defendants named in the indictment went to Cypress Lawn for the purpose of committing burglary,—that before they started five of the six armed themselves with loaded pistols; that on their return to the city so armed, and with burglars' tools and dynamite in their possession, Goucher, Kennedy, and Courtney, who were following at some distance behind the others, attempted to hold up a Japanese near the corner of Eighteenth and Valencia streets; that his loud outcry attracted the attention of a number of people and caused the trio to run; that Kennedy fired a shot as he ran to intimidate any

possible pursuer; that this attracted the attention of officer Robinson, who ran up to the group composed of appellant, Goucher, Henderson, and Kauffman, and said or did something which made them apprehensive that he would arrest or search them, and that he would discover. the burglars' tools and dynamite which Henderson was carrying,—that this was one of the contingencies in view of which the defendants had armed themselves, and that in order to avoid detection they, or some of them, had immediately opened fire on the officer, and that he had returned the fire of the one who first fired upon him—the man with the .44-caliber pistol, the bullets of which caused his death. Clearly there was no failure of evidence to show that officer Robinson was murdered, that the murder was the act of the appellant, and that it was willful, deliberate, and premeditated in a legal sense. Counsel for appellant makes a general and sweeping charge of unfairness and violation of the well-known rules of criminal procedure in the conduct of the trial in the superior court, which we think is entirely unsupported by the record to which he appeals. It is true that very numerous objections interposed by him to the admission of evidence were overruled, but his objections were founded upon an erroneous view of the case, and the rulings of the court were correct. He assumes that the prosecution relied exclusively upon the theory that the killing was done in pursuance of the conspiracy to commit the burglary at Cypress Lawn, and that the appellant must therefore be convicted of murder, although he did not participate in the killing, if it was done by any one of the six persons engaged in the conspiracy. On this assumption he objected to all evidence of the conspiracy, and at the end of the trial moved to strike it all out upon the ground that the conspiracy ended with the abandonment of the attempt upon the cemetery safe and before the killing occurred. But the case for the prosecution did not rest upon the doctrine of the liability of one conspirator for the acts of the others. The proof showed that the appellant himself fired the fatal shot; and the evidence as to the preceding circumstances—the arming, the possession of burglars' tools, etc.—was material and relevant to the motives and probable line of conduct of the appellant at the time of the killing. It is a part of the argument of counsel upon another point—at least, that seems to be his

argument—that in the absence of any evidence except that of an accomplice (Henderson) as to what took place at the very time and place of the killing, the defendant may have used his pistol in self-defense against one who did not announce himself an officer and was not in uniform. It is true that whether we regard the testimony of Henderson or not, we are left to conjecture which of the two—appellant or deceased— first drew his pistol and commenced firing. Apart from all other evidence except that going to show that the parties met and fought and that one was wounded and the other killed, a jury might not be warranted in finding that the survivor was not acting in self-defense. But when they are informed that the slayer was one of a party of burglars returning from an unsuccessful attempt, in preparation for which they had armed themselves with loaded pistols and provided dynamite and burglars' tools, then in their possession, that the person killed was a police officer attracted to the spot by a loud outcry followed by the discharge of a pistol by one of the party, they would be warranted in concluding that the officer did nothing more than his duty under the circumstances, because he had no motive to do more, and that the parties who had armed themselves for just such a contingency, and who had the strong motive to prevent the discovery of the burglars' tools in their possession, that they, or some of them, would put their pistols to the use for which they were provided, and that they deliberately murdered the officer to escape detection. In this view all the evidence as to the conspiracy, the arms, and the burglars' tools was material and relevant, and all the incidents of the trip to the cemetery and return, so far as they may have been irrelevant, were entirely harmless. (*People* v. *Pool,* 27 Cal. 572.) This is especially true of the proposal to break into the coal-yard. The only evidence as to that was Henderson's, and he testified that the appellant refused to have anything to do with it. The evidence of Costello as to the attempt by Kennedy, Goucher, and Courtney to rob the Japanese, his outcry, and the flight of the trio was of the *res gestæ;* it was the occasion of the shot by Kennedy and of the interference by the officer which led to his death.

The court was not only justified in overruling the objections to the testimony regarding the conspiracy upon the

ground above set forth, but upon the further ground that upon the evidence—circumstantial and direct—the jury would have been justified in concluding that a part of the common design was to resist arrest by the use of the pistols with which the defendants armed themselves. (*People* v. *Pool,* 27 Cal. 572.) Pistols are not used for breaking into a safe; their purpose is to kill those who interfere to prevent a burglary or arrest the perpetrators.

There is some inconsistency in the contention of counsel that the conspiracy was at an end and that Henderson was an accomplice. If the conspiracy was at an end, Henderson, according to his own testimony, was entirely innocent of the murder. He had no part in it either in design or act, and if the jury believed him his testimony alone fastened the crime upon the appellant.

It is claimed that the evidence does not warrant a verdict of murder in the first degree. We think is was clearly sufficient. It shows that the appellant made preparations to kill in connection with the projected burglary, and that when an officer approached him under circumstances indicating the probability that he would arrest him or search him he killed the officer. This is sufficient evidence of a deliberate purpose to kill, and if such purpose existed the killing was murder in the first degree.

Appellant complains that he was prejudiced by misconduct of the prosecuting attorney during the impanelment of the jury. The alleged misconduct consisted in a statement made in the hearing of the panel from which the jury was selected. In the indictment the appellant was named Frank Woods, *alias* Saint Louis Frank. After his arraignment and plea he moved the court to strike out the *alias* from the indictment. The court denied this motion, but instructed the clerk not to read the words "*alias* Saint Louis Frank" to the jury. When the assistant district attorney commenced his statement of the case to the talesmen preliminary to their examination touching their qualifications to act he used this language: "The defendants at the bar, Frank Woods, *alias* Saint Louis Frank, William Henderson"—— At this point he was interrupted by counsel for the appellant, who excepted to the reading of the *alias* from the indictment and assigned it as misconduct. The assistant district attorney and the district attorney himself,

who was present, begged the pardon of the court, and there the matter ended. We are not cited to any authority, and we know of none, for holding that the defendant in a criminal case is entitled to have any portion of a valid indictment suppressed during the trial except the charge of a prior conviction. But conceding that a prosecuting officer might be guilty of misconduct in purposely and wantonly parading the fact that a defendant is named with an *alias* in the indictment, with intent to prejudice him before the jury, there is nothing in this case to indicate that the prosecuting attorney was actuated by any such motive, or that his using the words complained of was other than an inadvertence. Indeed, it does not appear that Mr. Alford, who made the statement, had any knowledge of the instruction which the court gave to the clerk to avoid reading the *alias*. We do not think the discretion of the court was abused in denying a new trial on this ground.

It is claimed that the court erred in reading to the jury as part of his charge section 189 of the Penal Code, which defines murder in the first degree, and includes, among other things, all murders committed in the perpetration or attempt to perpetrate arson, rape, robbery, burglary, or mayhem. The contention of counsel is, that this was misleading and confusing, because it seemed to imply that under the evidence the jury would be warranted in finding that officer Robinson was killed by appellant or some of his co-defendants while they were attempting to commit a burglary. The charge of the court carries no such implication, and unless it can be said that it is error to give the full legal definition of murder in the first degree on the trial of an indictment for murder, the appellant has no cause of complaint as to this part of the charge, which, upon the whole, was a clear exposition of the difference between murder of the first and murder of the second degree.

Lastly, it is contended that the court committed a most flagrant and prejudicial error "in taking away from the jury the right to find the defendant guilty of murder in the second degree." Upon this point counsel cites a number of cases in each of which the trial court had erroneously instructed the jury to bring in a verdict of murder in the first degree in case they found certain facts. Nothing of the kind occurred in

CXLVII. Cal.—18

this case. The court correctly defined the two degrees of murder and informed the jury that a verdict of murder in the first degree would require the imposition of a sentence of death unless they should by their verdict fix the penalty at life imprisonment in the state's prison. In this connection the court stated to them what the form of the verdict should be according as they desired the infliction of the one penalty or the other. The omission to give the form of verdict of murder in the second degree cannot be regarded as an intimation that such a verdict was out of the question. The jury could not have failed to understand from the elaborate discussion of the difference between the two degrees of murder contained in the charge of the court that they were to determine by their verdict of which degree the defendant was guilty, if guilty at all.

The defendant's counsel, as the jury were about to retire, requested the court to furnish them with written forms of verdicts of murder in the second degree and manslaughter. This request was refused, but there was no exception to the refusal, and we need not consider whether such refusal was erroneous.

The judgment and order appealed from are affirmed.

McFarland, J., Angellotti, J., Shaw, J., and Lorigan, J., concurred.

Rehearing denied.