[Crim. No. 474. Third Appellate District.—December 5, 1919.]

THE PEOPLE, Respondent, v. MANUEL CORREA, Appellant.

[1] CRIMINAL LAW — CONSPIRACY — ACTS AND DECLARATIONS OF CO-CONSPIRATORS—EVIDENCE.—The acts and declarations of either of the conspirators, committed in pursuance and furtherance of the conspiracy, may be shown at the trial of a co-conspirator; and it is not necessary to show that the defendant on trial was present at the time of such conduct or declarations.

[2] ID.—AGREEMENT TO COMMIT CRIME—CIRCUMSTANTIAL EVIDENCE ADMISSIBLE.—On the trial of a co-conspirator, it is not necessary to prove by direct evidence that there was an agreement to commit the crime, but such fact may be established by circumstantial evidence, and it is sufficient to make out a *prima facie* case to warrant the admissibility of the acts and declarations of the co-conspirators.

[3] ID.—PROOF OF CONSPIRACY—EVIDENCE OF CIRCUMSTANCES.—As a general rule, a conspiracy can only be established by circumstances, and all these bearing in any way upon the fact of a conspiracy, or upon the acts done in pursuance thereof, may be shown to prove the fact of a conspiracy, and to show the intent or motive of a defendant for a crime involved in the commission of an overt act in furtherance and execution of the conspiracy.

[4] ID.—MURDER—MOTIVE—THEORY OF PROSECUTION—EVIDENCE.—In a prosecution for the crime of murder, it is proper for the district attorney to advance any theory, within the range of human experience and reasonable probability and to support that theory by appropriate evidence, although he may be entirely mistaken as to the motive for the crime.

APPEAL from a judgment of the Superior Court of Stanislaus County. Geo. H. Cabaniss, Judge Presiding. Affirmed.

1. Evidence in prosecution for conspiracy, note, 3 Am. St. Rep. 474.

The facts are stated in the opinion of the court.

Hatton & Scott for Appellant.

U. S. Webb, Attorney-General, and J. Chas. Jones, Deputy Attorney-General, for Respondent.

BURNETT, J.—Defendant was convicted of murder in the first degree, with punishment fixed by the jury at imprisonment for life, and he has appealed from the judgment and the order denying his motion for a new trial. At the outset we may say that there appears to be nothing inherently improbable in the testimony of any of the witnesses, and, therefore, under the familiar rule, we must accept as true the statements that correspond with and support the theory of the prosecution. Hence, it may be understood that in stating the facts, we have taken from the record the version of the affair which is disclosed by the evidence that tends to support such theory. It appears that, during the year 1917 and until August 26, 1918, Anton Sequeira, the deceased, with his family, consisting of a wife and four small children, lived on the Peter Stewart ranch, consisting of about 160 acres, and which was conducted as a dairy farm. This ranch fronted on the highway leading from Crow's Landing to Newman, in Stanislaus County, and the deceased and defendant conducted the same as partners. The defendant was unmarried and lived in the home of the deceased, sleeping in the bunkhouse which was attached to the residence. He had lived in this house continuously for eighteen months previous to the murder. No help was employed in conducting this dairy and the two divided the work between them. They were milking about sixty cows and each milked about thirty head; the defendant then attended to feeding the calves and some of the other stock, while deceased separated the milk and carried the skimmed milk to the pigs and then washed the separator. On the evening of August 26, 1918, the deceased and defendant were seen about 6 P. M., engaged in milking at the corral, which was at a distance of 520 feet from the residence. They usually finished their work about 9 P. M., and then went to the house for supper, but on this evening defendant did not appear at the house until about 10 P. M., and

then came in alone. Supper was had without the presence of deceased, and then, following their usual custom, all the inmates of the house engaged in prayer, and, thereafter, defendant left, supposedly to go to bed in his bunkhouse. The next morning, about 6 A. M., the dead body of deceased was found in a spring-wagon with a horse attached, at the home of Peter Stewart, a distance of nearly two miles from the home of deceased. The wagon wheels had become fastened in a tree and the horse was standing there when found by Stewart and his employee. Deceased was dressed in the overalls in which he milked, being an extra pair which he slipped over his ordinary clothes when commencing that task. The head of deceased was frightfully mutilated, showing four distinct blows which fractured and crushed the skull. The face and clothes were covered with blood and dried manure, and blood had leaked through the body of the wagon, forming a pool on the ground where the wagon stood. Deceased was lying on his back with his head near the end-gate and his feet under the seat, and his hat was in the body of the wagon. This horse and wagon belonged to deceased and were kept on the ranch at the time of the murder, although the horse formerly belonged to Mr. Stewart. After said discovery, Mr. Stewart notified the authorities, and a few hours thereafter the defendant was arrested and charged with the crime. The trial of the case consumed about eleven days, the witnesses being subjected to a very rigid examination by counsel for both parties, and every point being hotly contested by counsel for defendant. The learned judge who presided at the trial, Honorable George H. Cabaniss, of San Francisco, seems to have had a clear conception of the legal principles involved in the charge, and to have conducted the proceedings with striking regard for all the legal rights of the defendant. The instructions to the jury were complete and accurate, and no exception could be taken thereto. The rulings upon the admissibility of evidence were unusually free from error. The evidence itself, though circumstantial in character, is entirely sufficient, in our judgment, to support the verdict of the jury. We have taken pains to read carefully the entire record, consisting of over nine hundred pages, and we are convinced, not only that the verdict of the jury is supported, but that any fair-minded jury could hardly reach

any other conclusion than that the defendant committed the shocking crime.

I. The sufficiency of said evidence, however, to support the conviction is strongly contested by appellant, and it may be well to call attention to some of the salient facts to show how insubstantial is such contention. In doing this we may follow the method of the attorney-general in dividing the inquiry into the following considerations: 1. Where was Sequeira murdered? 2. When did the murder take place? 3. By whom was the deed committed and what are the circumstances showing defendant to be the guilty party?

1. Undoubtedly deceased was killed on his own premises. Indeed, no other theory is advanced by appellant. There is support for the contention of the prosecution that Sequeira was murdered on the path leading from the separator-house to the pig-pen and near said corral. This path was taken by deceased in carrying the milk to the pigs, and he would undoubtedly pass near the defendant while the latter was feeding the stock in the corral. The sheriff, his deputies, the coroner, and the neighbors present were able to trace the tracks of the wagon and blood stains from the Stewart home out on to the highway and along the same to a panel-gate opening upon the road from the premises occupied by deceased and defendant, and on through a rough, uneven field, across a creek and up to the point near the corral, where the ground was covered with fine dried manure. At this point the tracks of the wagon ended and here was found evidence of blood, and the ground appeared to have been raked over. Two parallel lines in the dry manure indicated that the body had been dragged to a point where the wagon tracks commenced. It may be added that the manure on the face and clothing of the deceased corresponded in appearance with that found at this point. Other circumstances are disclosed, which, in connection with the foregoing, demonstrate to a moral certainty that Sequeira met his death on his own premises, and from which it is at least a reasonable inference that he was struck down at or near the point as claimed by the prosecution.

2. The last seen of Sequeira alive by any person appears by the testimony of the defendant, who says that he saw deceased going into the separator-house as he, Correa, was coming out. This was after the cows had been milked and

the defendant was then feeding the stock in the corral while deceased was carrying milk to the pigs, and it was about 8:30 P. M. As to when they finished milking, appellant testified: "I think it was after 8 o'clock." It was probably a short time after this that Sequeira was killed. The work of separating the milk, feeding the pigs, and washing the separator occupied about thirty minutes, and it followed immediately after the cows were milked. This additional task was not entirely completed, as the separator was not washed and the cream was not placed in its usual position. One Mattos, who collected the cream, drove into the place a few minutes after 9 o'clock and found the can of cream was not in its accustomed place and the light out in the separator-house. It is fair to infer that the light would have been burning if Sequeira had been alive, as his work was not completed. We may add that when Correa went to supper about 10 o'clock the said light was burning. Of course, someone must have lighted it after Mattos left the premises, and the identity of that person is not at all shrouded in doubt when the entire record is considered. Correa was the man. From the foregoing it is a reasonable certainty that Sequeira met his death in the neighborhood of 9 o'clock. It may be stated in this connection that this inference as to the time of death is consistent with the expert testimony as to the number of hours that life had been extinct, when the body of Sequeira was examined the next morning, although there was no attempt by said expert to fix the exact time when death ensued.

3. If Sequeira was killed on said premises after the cows were milked and before Correa went to the house for his supper, then the conclusion is almost irresistible that the defendant was the perpetrator of the crime. That this may be made plain we shall mention some of the circumstances that point directly to him as the guilty man. Some of them alone would justify the verdict, but taken together they constitute an overwhelming vindication of the people's contention. In the first place, Correa was confessedly in such situation that Sequeira could not have been killed without the defendant's knowledge. He must have known who committed the murder, and, of course, if it had been done by another, the defendant would have disclosed it; he would have been the first to acclaim the fact. The truth is

he contended, and still contends, that he knows nothing about it. We can understand how the jury, with his testimony and the other circumstances, including the diagram of the premises, before them, could not escape the conclusion that his asserted ignorance was preposterous and that his story was a weak and simulated attempt to escape a just and merited conviction. Again, a bloody hammer and some pieces of bloody cloth were secreted in the separator-house. There is almost indubitable evidence which we need not recite—that the blows on Sequeira's head were struck with this hammer. The hammer belonged on the place, and no stranger would come to the premises with the intention of committing murder and depend upon finding there such a weapon with which to carry out his purpose. He would have brought his weapon with him. If he had come so unprepared to execute his intention, he would certainly have found it difficult to find the hammer in the darkness, and while he was looking for a weapon; it is hardly to be supposed that Sequeira would have calmly awaited the end without an outcry or any attempt to escape. The hammer was used for the deadly purpose by one who knew it was on the premises, and at a time when Sequeira was not apprised of the imminent approach of death. It was also concealed by one who was entirely acquainted with the premises. That one was Correa. While the evidence as to the cloths is not so persuasive, yet it is not unreasonable to conclude that they were used also by the same cruel hand that struck the blows. Again, a stranger would not go to the trouble of raking up the ground where the crime was committed. He would let the body lie where it fell and he would hasten to make his escape. Besides, how could he do any or all these things without the knowledge of Correa? Moreover, it is incredible that a stranger would remove the body from the premises, or that he would go within 110 feet from the house to get the wagon when the light was still burning in the Sequeira home; and it is quite improbable that he would know that the wagon was there or that he would be able, in the darkness, to get the horse and the right harness, or that he would be able to put the body in the wagon and drive out without attracting the attention of the inmates or of Correa, who was outside all this time. But what is more improbable is that a stranger would select

that particular horse, Bob, which had been purchased from Mr. Stewart, and turn him loose on the highway near Mr. Sequeira's house with the lines dragging on the ground, knowing that the horse, true to his instincts, would take his way to his former home. Nor is it at all probable that the house dog, which was with Correa when he came to supper, would have failed to manifest, by barking, his resentment at the presence and such activity of a stranger, especially at that hour of the day. It is quite unlikely, also, that another bent upon murder would wear the same size shoes as defendant and that they would make the same peculiar track. Such, however, was the situation of the one who led the horse out through said panel-gate to the highway leading to Mr. Stewart's house. The horse and wagon were taken out on to the highway, about 11 o'clock, as by a witness they were seen going toward Mr. Stewart's at about 11:15 P. M. without a driver. Defendant left the house after supper about this hour for the apparent purpose of going to bed, but actually, no doubt, to try to conceal his crime. Defendant was one hour late for supper that night, without any satisfactory explanation. He arose the next morning and began milking at an earlier hour than usual, realizing that he would not have the help of his partner. His appearance and actions, when told of the murder; his appearance when the sheriff first talked to him; his footprints through the field and out to the highway where the corpse was taken; the route taken by the wagon, indicating a thorough knowledge of the premises by the one leading the horse; his statement at the house when arrested; his quarreling with the deceased and his unsatisfactory manner of testifying, including his statement that he did not know where his partner slept, although he had resided in the same house for eighteen months, constitute an important part of the circumstances that explain and justify the verdict of the jury. We shall dwell no longer upon this phase of the case further than to add that the record has been examined with a realization of the consequences to defendant of the judgment, but it must be said that great consideration was shown him by the jury in fixing the penalty at imprisonment for life.

II. In his opening statement the district attorney advanced the theory that the motive for the crime was to be

found in a conspiracy between defendant and the wife of deceased to commit the murder in order to profit by reason of certain life insurance policies. ˊ Such theory is important here only to determine whether certain rulings of the court, admitting evidence of the conduct and statements of Mrs. Sequeira, can be sustained. **[1]** The rule is, unquestionably, that the acts and declarations of either of the conspirators, committed in pursuance and furtherance of the conspiracy, may be shown at the trial of a co-conspirator; and it is not necessary to show that the defendant on trial was present at the time of such conduct or declarations. (*People* v. *Brown,* 59 Cal. 345; *People* v. *Woods,* 147 Cal. 265, [109 Am. St. Rep. 151, 81 Pac. 652].)

**[2]** It is also true that it is not necessary to prove by direct evidence that there was an agreement to commit the crime, but such fact may be established by circumstantial evidence, and it is sufficient to make out a *prima facie* case to warrant the admissibility of the acts and declarations of the co-conspirators. (*People* v. *Eldridge,* 147 Cal. 782, [82 Pac. 442]; *People* v. *Burke,* 18 Cal. App. 72, [122 Pac. 435].)

**[3]** As a general rule, a conspiracy can only be established by circumstances, and all these bearing in any way upon the fact of a conspiracy, or upon the acts done in pursuance thereof, may be shown to prove the fact of a conspiracy and to show the intent or motive of a defendant for a crime involved in the commission of an overt act in furtherance and execution of the conspiracy. (*People* v. *Trim,* 39 Cal. 75; *People* v. *Gregory,* 120 Cal. 16, [52 Pac. 41]; *People* v. *Carson,* 155 Cal. 164, [99 Pac. 970].)

As evidence of the guilty knowledge and co-operation of Mrs. Sequeira in reference to the murder, the attorney-general calls attention to these circumstances:

1. She falsely told Mrs. Silveria that she had to get supper early because her husband was going out that night.

2. She testified that her husband told her not to wait for supper, as he was going out when he finished the chores.

3. She claimed that Correa was being arrested when he was innocent.

4. She went to bed the night of the murder with her clothes on.

44 Cal. App.—41

5. There was evidence of clothes having been burned in the kitchen stove that night.

6. She told her brother-in-law not to look for the murderer around the premises.

7. She testified falsely for Correa that he and her husband never quarreled, whereas, she told her son-in-law that she was going to quit her husband because he quarreled continuously with his partner.

8. She tried to influence her niece to testify falsely that her husband was in the habit of going out at night without his supper.

9. Before the body of Sequeira was discovered she sent a messenger to Mr. Stewart's house to tell Mr. Stewart that her husband left with the horse Bob and the spring-wagon the night before at 10 P. M. and had not returned.

We think the showing was sufficient to make out a *prima facie* case of conspiracy and to render admissible against the defendant the acts and declarations of Mrs. Sequeira in furtherance of said conspiracy.

III. But independent of the question of conspiracy, it is quite apparent that no prejudicial error was committed in the admission of the evidence of which complaint was made on the motion for a new trial. One instance is involved in the testimony of Mrs. Rose Azavedo that about two weeks before the murder Mrs. Sequeira was visiting her and they had a conversation in reference to Mr. Sequeira in which Mrs. Sequeira said that "her husband looked awful queer and said she thought that he was going to commit suicide." This was in response to the question: "What was that conversation?" The preceding question was: "Did you have any conversation with her then relative to the death of her husband, or his dying?" and the answer, "Yes." So that, appellant had abundant warning of what was coming, but he made no objection to any of these questions, nor did he move to strike out any of the answers. A subsequent question as to further conversation was objected to and the ruling was in favor of appellant; but for the reason stated, it is too late to complain of the quoted testimony.

A similar situation is involved in the other instance relating to the testimony of Emil Mattos, the son-in-law of Mr. and Mrs. Sequeira, as follows: "Q. Did Mrs. Sequeira visit your home, I mean to stop there overnight, along about six

weeks before her husband died? A. She did. Q. At that time did you have a talk with her in reference to her husband? A. I did. Q. What was it she said? A. She said she was going to get away from my father-in-law, . . . because Tony Sequeira, my father-in-law, and Manuel Correa they were quarreling lots of time." The record shows no objection whatever to any of these questions, and no further comment is necessary.

The only other matter in this connection relates to the evidence of efforts made by Mrs. Sequeira to collect the insurance on the life of the deceased. But she and the defendant both testified without objection that said policies existed, and any effort to collect the money could add nothing to the force of this evidence as a motive for the crime. No one would suppose that she would not try to realize upon the policies, and the probative force of said circumstance was not increased by the showing of such effort. We may add that, if there was a sufficient showing of conspiracy, the evidence was admissible under the doctrine of *People* v. *Fealy*, 33 Cal. App. 605, [165 Pac. 1034].

[4] It may be, of course, that the district attorney was entirely mistaken as to the motive for the crime, but it was his privilege to make such contention as to the insurance. Another different impelling force is disclosed in the disagreements of deceased and the defendant, and the jury may have attached great significance to the command of Sequeira for Correa to secure another boarding place, but the peculiar circumstances that inspired the deed must necessarily be the subject of controversy and uncertainty, and it was proper for the people to advance any theory, within the range of human experience and reasonable probability, and to support it by appropriate evidence.

IV. Really, the only consideration worthy of serious controversy involves the contention that a new trial should have been granted on the ground of newly discovered evidence. It seems that, a few days after the murder, a quantity of manure, saturated with what appeared to be blood, and taken from the place where the prosecution claimed that Sequeira was killed, was delivered by the sheriff to Dr. Charles D. Holliger, an expert Roentgenologist and pathologist, of Stockton, who made the usual tests to determine whether the matter contained human blood. He was not

called as a witness at the trial, and the result of his examination was not known to appellant until after his conviction. On the motion for a new trial the defendant relied upon the affidavit of said Dr. Holliger, in which he deposed "that said debris contained a large percentage of blood and that said tests further showed that said blood was not the blood of a human being." This affidavit surprised the trial judge and he considered it a matter of grave import. He undoubtedly gave the subject very careful attention, and he reached the conclusion that "the blood found in the manure pile was not human blood," but he further declared that it did not follow "that all other blood found at various places indicated by blood stains and the like was of the same character. By beginning at the other end of the trial . . . we find no difficulty—at least I find none—in convincing ourselves that that blood was human blood." This was followed by a statement by the trial judge of his reason for concluding that the case against the defendant was complete without this circumstance of the blood in the manure pile. He therefore denied the motion for a new trial. We think no one can dispassionately read the record without agreeing that his decision was right.

We may add that the force of said affidavit of Dr. Holliger was somewhat weakened by a counter-showing that by reason of the fact that said blood was subjected to the chemical action of the manure and the heat of the sun, the usual tests for determining its character would not be entirely reliable. There would be also ground for holding that appellant did not display that diligence in obtaining said evidence which the law exacts. His affidavit does not allege that he had no knowledge of the existence of said blood in the manure pile. We must assume, therefore, that he knew it was there as early as the morning of August 27th, and it was his duty to inform his counsel in order that they might take the proper steps to have an analysis of it.

A word more, and we are through. Appellant's counsel with great earnestness and ability, insist, in their opening brief, and reiterate in their closing brief, that their client is innocent of the charge and should be granted a new trial. They very naturally accept his denials and explanations and they are not to be blamed for it. They think it is incredible that "the appellant could have knelt and prayed with the widow and children of Sequeira if he had taken the life

of Sequeira.'' To the normal mind, incapable of conceiving and planning murder, that does seem almost unthinkable, but the murderer must be judged by a different standard from the ordinary man. That he should do that thing does seem strange, but not so strange as the murder itself. That Sequeira was murdered is beyond question, and the record seems to leave little, if any, doubt that Correa committed the crime. We are not surprised, therefore, at his conduct after Sequeira was killed.

As we believe the defendant has suffered no injustice, and we find in the record no prejudicial error, the judgment and order are affirmed.

Ellison, P. J., *pro tem.*, and Hart, J., concurred.