[Crim. No. 4917.   Second Dist., Div. One.   Nov. 3, 1953.]

THE PEOPLE, Respondent, v. PETER M. THEODORE
et al., Appellants.

Morris Lavine for Appellants.

Edmund G. Brown, Attorney General, Michael J. Clemens, Deputy Attorney General, S. Ernest Roll, District Attorney (Los Angeles), Jere J. Sullivan and Robert Wheeler, Deputy District Attorneys, for Respondent.

WHITE, P. J.—In Count I of an information filed by the district attorney of Los Angeles County, defendants Peter M. Theodore and Charles E. Melton were charged with criminal conspiracy to commit grand theft, 21 overt acts being set forth. In Counts II, III, IV, V and VI, defendant Theodore

only was charged with grand theft, each count alleging the felonious taking of money from Fay B. Langendorf.

The jury returned verdicts of guilty as charged upon all counts of the information. Motions for a new trial were denied and judgments pronounced, execution thereof being suspended and defendants granted conditional probation. The appeals now before us are from the judgments and the orders denying motions for a new trial.

For a consideration of appellants' contentions, an epitome of certain portions of the evidence is necessary.

The defendants Melton and Theodore posed as father and son, the son being known as "Ted Melton," but it is undisputed that they were not related. They had first met in 1934 or 1935. In 1949 Theodore ("Ted Melton") told his true father that he was going to California, where he might find "some good suckers." In February, 1950, Theodore and Melton met in the latter's room in Santa Monica. Melton allowed Theodore to have his Lincoln Continental automobile. Melton told his landlady that his "boy" was coming to see him; that they had not met for 15 years.

Allen R. Langendorf, husband of the complaining witness, Fay Langendorf, operated a real estate brokerage office in Santa Monica. Mr. and Mrs. Langendorf jointly owned some stock in Langendorf Bakery. In March, 1950, defendant Melton appeared at the Langendorf real estate office and asked to work there as a salesman. To this Langendorf agreed. Subsequent to Melton's entering the office as a salesman the witnesses Fred Ballagh and Mr. and Mrs. Felmar came to work in the same office.

Mrs. Langendorf first met defendant Melton early in April, 1950, at her husband's real estate office. Mrs. Langendorf came frequently to the office, and during the period from early April until about May 15, 1950, she had approximately 18 conversations with Melton, in which he talked about his "son," "Ted Melton." Defendant Melton repeatedly stated that he had not seen his "son" for a couple of years; that he was expecting his arrival from the oil fields of Wyoming in about a month. He further stated to Mrs. Langendorf (and others) that his "son" was a brilliant attorney, an oil engineer, and a C.P.A.; that he was doing work for a number of oil companies; that he had had many transactions on the New York Stock Exchange, was an expert in stocks, and had made a great deal of money in stocks. Melton further said that his "son" had attended U.S.C., U.C.L.A., and

the University of California. Mr. Langendorf and Mr. and Mrs. Felmar were present at some of these conversations. In June, 1950, defendant Melton told the witness Ballagh that his "son" was a noted geologist and oil man.

Shortly after he came to work at the Langendorf office, Melton made statements to Mr. Langendorf concerning his "son" similar to those immediately above set forth, adding that his "son" had attended an eastern university, had a substantial income from oil royalties and a large salary, because he combined the work of a lawyer and an engineer; that he was connected with a brokerage office and "made money" for everybody he ever advised on stocks, oils and investments. These and similar statements Melton continued to make up to the time of the arrival of the "son" on the scene about May 15, 1950, and also thereafter.

By defendant Theodore's own admissions on the witness stand, it appears that he had never attended U.S.C. or U.C.L.A.; defendant Melton was not his father; Theodore had never been an attorney, never went to law school; was never a certified public accountant or an oil engineer; he had "not very much" experience in the stock market, and did not really understand the meaning of buying stocks on margin until it was explained to him by a broker during his stock transactions with Mrs. Langendorf. In the Army he had been a private and a private first-class, and not an Air Force captain. He did not have "connections" with Texas people dealing in oil royalties, as had been represented.

Defendant Melton made admissions to investigators. He admitted that a man named Yant, whom he had introduced to the Langendorfs had "done time" in connection with the sale of oil interests; that Theodore had telephoned him (Melton) three or four times from New York before he introduced Theodore to the Langendorfs; that he had "faked" long distance telephone calls with reference to Theodore's supposed $30,000 job with an oil company in South America; that he had maintained throughout that Theodore was his son; that the story of the South American job was building up to the "take"; that he knew what Theodore's "front" was for; that he was "building the guy up." He knew Theodore was obtaining money from Mrs. Langendorf.

Defendant Theodore, in the role of "Ted Melton," arrived at Langendorf's real estate office driving a Lincoln Continental automobile. Mr. Langendorf was present, and also

Mrs. Felmar. "Father" and "son" staged a touching reunion, embracing each other, and the "father" weeping.

Thereafter Theodore and the Langendorfs became friendly, going out socially together and meeting at Theodore's apartment at an exclusive Beverly Hills hotel. Included in the party from time to time were Kay George and Sophie Efthim (whose testimony as to their financial difficulties with Theodore was admitted, over objection, as evidence of "similar transactions").

Theodore advised Mrs. Langendorf that the only way she could protect herself against her husband's gambling proclivities and "gamblers" was to sell the stocks held by them (as to which Mr. and Mrs. Langendorf had signed "joint stock powers"). He showed her Mr. Langendorf's check for $150 which he stated represented a loan and that Mr. Langendorf said he needed it right away as he was in a terrible gambling debts "jam" for as much as $20,000. (Mr. Langendorf testified he had never had large gambling debts.)

During the period from June 12, 1950, to July 14, 1950, Theodore persuaded Mrs. Langendorf to entrust him with sums of cash derived from the sale by her of stocks. He undertook to use the money to purchase oil royalties from which he said she would realize returns of from 20 per cent to 25 per cent, and to open a brokerage account with a firm of Beverly Hills brokers in her behalf and secure her substantial profits through his expert manipulations. Upon receiving the money from time to time he consistently refused to give a receipt, saying that he dealt in cash and thereby saved a great deal on income taxes. He proposed that they each invest a similar amount in a "pool" and buy on margin, but that he should handle the account.

From June 12 to July 14, Mrs. Langendorf gave to Theodore a total of $26,700, in the respective sums of $5,000, $3,000, $5,000, $4,200 and $9,500, each of these sums constituting the basis of the five counts of grand theft contained in the information. Of this total of $26,700, he deposited $9,000 in his own bank account and $17,700 into his brokerage account. He never purchased any oil royalties for Mrs. Langendorf. He never deposited any of his own money in the brokerage account. He did not cause the account to be made a joint account, nor did he have himself described as a trustee; the account stood in his name alone. Further details as to these transactions, involving a payment by the brokers to Mrs. Langendorf and a withdrawal by Theodore

from the brokerage account, need not be set forth, as no contention is made (nor could it well be made under the evidence) that the evidence is insufficient to support the several verdicts. For the same reason it is unnecessary to recite additional evidence as to the subterfuges and falsehoods by which Theodore obtained the funds from Mrs. Langendorf and thereafter put off her demands for an accounting. Only enough of the voluminous testimony has been set forth to show the method of operation of the defendants in the commission of the crimes of which they were convicted, so as to demonstrate the correctness of the rulings of the trial judge in admitting evidence of representations made to the husband of the complaining witness and evidence of the "similar transactions" had with the witnesses Kay George and Sophie Efthim.

Appellants' contention that the court erred in admitting testimony by Mr. Langendorf concerning representations made to him is without merit. The defendants were charged in Count I of the information with conspiracy, 21 overt acts being set forth. The crimes of grand theft contained in Counts II to VI were separate substantive offenses and were not included as overt acts under Count I.

The claim of appellants that Mr. Langendorf's testimony concerning appellant Melton's conversations with the witness was inadmissible because it was hearsay as to appellant Theodore is untenable. Both appellants were jointly charged in Count I with the crime of conspiracy to commit grand theft. The gist of the offense of conspiracy is the formation of a combination with others to do some unlawful act or some lawful act by unlawful means. It is incumbent on the prosecution to prove a criminal agreement *and* an overt act done in furtherance of the objects of the conspiracy. (Pen. Code, §§ 182, 184.)

That the compact or agreement between the conspirators may be shown by circumstantial evidence is firmly established by the courts. (*People* v. *Pierce,* 110 Cal.App.2d 598, 610 [243 P.2d 585].)

As stated in *People* v. *Schmidt,* 33 Cal.App. 426, at page 444 [165 P. 555]: ". . . It is a fundamental rule long settled by decisions that in proving a conspiracy it is not necessary that proof be made that the parties met and actually agreed to undertake the performance of the unlawful act, and that a conspiracy may be shown by proof of facts and circumstances sufficient to satisfy the jury of the existence

of the conspiracy, leaving the weight and sufficiency of the evidence to the triers of the questions of fact . . . '*Evidence of the statements of a co-conspirator made during the life of the conspiracy, are admissible against the other conspirator.*' (*People* v. *Oldham,* 111 Cal. 648, (44 Pac. 312).)'' (Emphasis added.) (See, also, *People* v. *Burton,* 91 Cal.App.2d 695, 708 [205 P.2d 1065]; *People* v. *Correa,* 44 Cal.App. 634, 641 [186 P. 1055].)

All of the conversations between appellant Melton and Mr. Langendorf were properly admitted in evidence as tending to establish a conspiracy between Melton and Theodore. Such conversations were but a part of the conversations had by Melton and Theodore with other persons around the Langendorfs' real estate office as to the alleged attainments and business qualifications of Melton's so-called ''son'' Theodore, things that were said to Mr. and Mrs. Felmar and to Mr. Ballagh as well as to the Langendorfs, and all of which had a bearing upon the conspiracy as showing Melton's false ''build-up'' of Theodore for the purpose of establishing his ''son'' as a man worthy of confidence and trust.

When consideration is given the over-all *modus operandi* of appellants' scheme to defraud, it is manifest that the testimony warranted the conclusion that appellant Melton was to be, as respondent suggests, the ''advance man''; that it was he who had to ''soften up'' the opposition for the major blow to be performed by the artist Theodore. Melton ''fattened'' up the bait for the ''kill'' to be made by Theodore. Thus his conversations with the husband of the victim of the conspiracy and grand theft charges were relevant and material in fitting together the various parts which made up the complete whole of the conspiracy.

Because criminal conspiracies are generally proved by circumstantial and piecemeal evidence, a wide latitude must be given the prosecution in producing its evidence. (*People* v. *Stevens,* 78 Cal.App. 395 [248 P. 696]; *People* v. *Bateman,* 111 Cal.App. 109 [295 P. 530]; *Metzler* v. *United States,* 64 F.2d 203.)

As so aptly stated by the court in *People* v. *Stevens,* 78 Cal.App. 395, at pages 406 and 407 [248 P. 696]:

''A conspiracy may have a very small and very remote beginning. Like a gigantic member of the forest, it may originate in a tiny tendril, which requires a long time and a persistent nurture to be developed into the matured monarch of the grove. It is for this reason that it is said in a standard

publication that, in conspiracy cases, 'it is no objection that the evidence covers a great many transactions and extends over a long period of time, that it may show another crime, that the acts, evidence to show which is offered, occurred some time before the alleged formation of the conspiracy, provided, however, that the facts shown have some bearing on and tendency to prove the ultimate facts at issue.' (12 C.J. 635.)''

■ It is next contended that the court erred in admitting the testimony of Katherine Vasila and Sophie Efthim on the theory that they were ''similar transactions.''

In May, 1950, Theodore talked to Miss Vasila two or three times, urging her to invest her money, telling her he had over $200,000 worth of U. S. Steel; that he could invest her money for her in stocks through his New York broker *in her name* and she would receive $20 a month income. On May 12, 1950, she gave him $1,000 in cash, receiving no receipt. When she asked him for her stocks he told her it would take time for them to come through from New York. He paid her $20 as interest on two occasions. Although she repeatedly asked for her stocks, she never received them, nor did she ever receive any money from Theodore. In June, 1951, the night before the preliminary hearing in this cause, at the home of the attorney who represented him at the preliminary hearing, Theodore gave Miss Vasila his promissory note for the money due her.

Sophie Efthim first met Theodore in January, 1944. He told her he had attended U.S.C., U.C.L.A. and the University of Montana. In April, 1950, in St. Louis, Missouri, Theodore told Miss Efthim that it was silly to keep her money in a bank when she could earn 15 per cent in stocks through his broker *under her name*. In June, 1950, she came to California at Theodore's invitation and stayed at a hotel for which accommodations Theodore paid the rental. In September, 1950, in St. Louis, Theodore asked her to reconsider investing, and she later sent him by registered mail to Phoenix, Arizona, $600. In January, 1951, he told her he could not understand why she had not received her stock certificates; in June, 1951, he replied by telephone to her letters and told her that her money was safe with him. In July, 1951, in St. Louis, he told her he was not going to keep her $600 in stocks, but put it in something better, a gift shop in Phoenix; that he would send her articles of incorporation to sign. She later sent him an additional $250

and then $200 more, believing she would be on the board of directors and receive stock. Just before the trial of this cause Theodore phoned her and asked her not to "play ball" with the Langendorfs. Miss Efthim never received any money back from Theodore except $45, nor did she receive any stock. (When Theodore was unsuccessfully attempting to settle with Mrs. Langendorf shortly before the preliminary hearing, he offered to give the Langendorfs a half-partnership in a Phoenix costume jewelry business.)

Appellants urge error in the admission of the foregoing testimony of Katherine Vasila and Sophie Efthim on the ground that transactions between them cannot be characterized as similar.

A review of the evidence, however, at once suggests a striking similarity in the technique and scheme followed by appellant Theodore in his dealings with Mrs. Langendorf, the complainant herein, and the Misses Vasila and Efthim. Therefore, the testimony of the latter two witnesses relating to their dealings with appellant Theodore was properly admitted for the limited purpose of showing his fraudulent intent, his plan, scheme or design to defraud, and the absence of mistake on his part. The jury was adequately and correctly instructed by the trial judge as to the limited purpose of such evidence.

In answering a contention that the court erred in. admitting evidence of similar transactions, our Supreme Court, in the case of *People* v. *Whalen,* 154 Cal. 472, 476 [98 P. 194], said: "Evidence was given upon the trial that the defendant, prior to the transaction in controversy, had made substantially the same representations to other persons in an endeavor to sell to them stock in the same company. It was proper for the court to admit evidence of this character to show that the representations were not inadvertent, but were deliberately made, with knowledge of the facts, and with intent to deceive. 'Evidence of similar offenses involving the making of other false representations, is admissible against the prisoner to show that he is aware of the falsity of the statements made by him in the present case, and that, knowing them to be false, he made them with the intent to deceive.' "

*People* v. *Albertson,* 23 Cal.2d 550 [145 P.2d 7], does not aid appellants because it is easily distinguishable under the facts and circumstances here present.

Appellants earnestly assert prejudicial error in the ruling of the trial court permitting, for the purpose of impeachment, proof that appellant Theodore had suffered a prior conviction of a felony.

In this regard, the record reflects that on cross-examination of appellant Theodore, he was asked if he had theretofore been convicted of a felony—that of using the United States mails to defraud. His answer was that he had not been so convicted. Thereupon, over objection, the prosecution offered in evidence an exemplified copy of the judgment and commitment in the District Court of the United States, Western District of Missouri. The proffered record was objected to on the ground that no foundation was laid, that more has to be shown than merely similarity of names; that the judgment was a sentence to a jail and could not be a felony for any purpose under the laws of this state; and that the exhibit was incompetent, irrelevant and immaterial. From the document in question, among other things, it appears that the title of the case upon which the indictment was based was: "United States v. Peter Michael Theodore, alias George Theodore, alias Thomas Hart." It also appears that there is a "Judgment and Commitment" against "Peter Michael Theodore" only, showing that on the 28th day of February, 1941, the defendant was "convicted on his plea of guilty of the offenses charged in the indictment in the above entitled cause, to-wit, using the United States mails in furtherance of a scheme to defraud." The defendant was "committed to the custody of the Attorney General for imprisonment in an institution of the jail type to be designated by the Attorney General or his authorized representative for a period of sixty (60) days, without costs."

■ Section 2051 of the Code of Civil Procedure provides that a witness may, by way of impeachment, be asked whether he has been convicted of a felony, and may also be asked the nature of the felony (*People* v. *Chin Hane,* 108 Cal. 597, 607 [41 P. 697] ; *People* v. *Putman,* 129 Cal. 258 [61 P. 961] ).

■ Appellant Theodore, having voluntarily taken the witness stand, was obviously subject to impeachment in the same manner as any other witness, under this section.

■ And, when an accused denies the prior conviction it is proper to produce a duly authenticated copy of the judgment of conviction (*People* v. *Chenault,* 74 Cal.App.2d 487, 493, 494 [169 P.2d 29] ; *People* v. *Chin Hane, supra,* p. 607).

28

██ Appellant Theodore contends that the prosecution did not sufficiently establish his identity as *the* Peter Michael Theodore named in the said judgment and commitment. Such a contention, however, disregards the nature and value of a presumption. Under section 1963, subdivision 25, of the Code of Civil Procedure, there is a presumption of identity of person from identity of name. The presumption is a rebuttable one, but in the case at bar appellant Theodore offered no evidence to rebut the presumption that he (Peter Michael Theodore, which he testified was his full name) was the Peter Michael Theodore named in the judgment and commitment received in evidence. ██ It is a rule of law that a presumption constitutes a species of evidence which, unless controverted, is sufficient proof of the existence of the fact to which it relates (*People* v. *Williams,* 125 Cal.App. 387, 388 [13 P.2d 841]; *People* v. *Little,* 41 Cal.App.2d 797, 799 [107 P.2d 634, 108 P.2d 63]; *People* v. *Sberno,* 22 Cal. App.2d 392 [71 P.2d 274]; *Hefferman* v. *United States,* 50 F.2d 554).

Appellants next insist that the foregoing presumption "clashes" with the presumption of innocence. We fail to see the force of this argument. All presumptions as heretofore stated, are a species of evidence. ██ Conclusive presumptions (Code Civ. Proc., §§ 1961, 1962) are not overcome by the presumptions of innocence, nor are many disputable presumptions so overcome (*People* v. *LeDoux,* 155 Cal. 535, 553 [102 P. 517]; *People* v. *Cline,* 79 Cal.App.2d 11, 15 [179 P.2d 89]).

Appellant next argues that since the punishment imposed for the previous conviction of a federal offense was a jail sentence of 60 days, it was not a felony in California (Pen. Code, § 17), and therefore could not be used to impeach the testimony given by appellant Theodore.

It should be remembered that we are not here concerned with the effect of prior felony convictions other than prior conviction of a felony as a basis for impeachment of a witness. The question is what is meant by the language of section 2051 of the Code of Civil Procedure that a witness may be impeached by showing by "the record of the judgment, that he has been convicted of a felony." In solving that question, we are impressed that cases based upon specific California Penal Code provisions as to prior conviction of a felony with respect to habitual criminals or as bearing upon punishment and the right to probation, etc., have no application to the precise question now before us.

■ Appellant Theodore, it appears, relies on the rule applicable to the habitual criminal statute in California (Pen. Code, § 644a), and Penal Code, section 17, which defines felonies and misdemeanors. We are satisfied that the provisions of section 644a of the Penal Code have no application here, and that section 17 of the same, code applies to crimes committed in this state, and has no application to crimes committed in other jurisdictions.

Whether or not a crime committed outside of California is a felony or misdemeanor for the purposes of impeachment, depends upon the law of the jurisdiction in which the offense was committed. As was said by this court in *Caminetti* v. *Imperial Mutual Life Ins Co.*, 59 Cal.App.2d 476, 490 [139 P.2d 681]: "... That the offense charged was a felony must also be conceded (18 U.S.C., 541; *State* v. *Fousek*, 91 Mont. 448 [8 P.2d 791, 84 A.L.R. 303]). True, a different rule is prescribed by our statute which classifies crimes after judgment as felonies or misdemeanors according to the penalty actually imposed (Pen. Code, section 17). *But that statute has application only to crimes under our state statutes and has nothing to do with crimes denounced by the federal statutes. It is the law of the jurisdiction where the crime was committed that determines the character of the offense as a felony or a misdemeanor (State* v. *Fousek, supra)."* (Emphasis added.) Accordingly, in order to determine the character of the offense committed and which is here involved, we must look to the federal law under which appellant Theodore was convicted.

The section defining felonies and misdemeanors under federal law, and which was in effect at the time of appellant Theodore's alleged prior conviction in the federal court, reads as follows:

*"Section 541. (Criminal Code, section 335.) Felonies and misdemeanors. All* offenses *which may be punished* by death or imprisonment for a term exceeding one year, shall be deemed felonies. All other offenses shall be deemed misdemeanors. (March 4, 1909, c. 321, sec. 335, 35 Stat. 1152.)" (United States Code Anno. tit. 18, Crim. Code and Criminal Procedure, § 541 to end, 1940 ed., including pocket parts, pp. 3-4.) (Emphasis added.)

■ While in California the rule is that the character of an offense punishable by imprisonment in the state prison or by fine or imprisonment in a county jail, is determined by the actual sentence imposed, the rule under the federal

law is that the length of *possible* sentence which *may* be imposed is determinative.

In *Creekmore* v. *United States*, 237 F. 743, at page 754 [150 C.C.A. 497, L.R.A. 1917C 845], it was said: ". . . It will be observed that section 335, in defining felonies, said nothing about penitentiaries. *It is the length of possible imprisonment that fixes whether the offense is a felony or a misdemeanor.* It must be borne in mind that, while nearly all of the states have both penitentiaries and jails, the United States has no prisons except its penitentiaries, save as it has the use of state institutions. We see no reason why, under Judicial Code, section 268, the court could not sentence a guilty party for a year and a day, and, *if it had this power, then section 335 of the Criminal Code made it a felony . . .*" (Emphasis added.) See, also, *State ex rel. Anderson* v. *Fousek*, 91 Mont. 448 [8 P.2d 791, 84 A.L.R. 303, 307-309].

▮ Directing our attention now to the facts in the instant case, the statutory offense for which appellant Theodore was previously convicted was a violation of section 338, title 18, U.S.C.A. At the time judgment was pronounced and commitment issued on the previous conviction of appellant Theodore, the penalty prescribed for a violation of said section was as follows: ". . . shall be fined not more than $1,000.00, or imprisonment not more than *five years or both*" (18 U.S.C.A. Crim. Code and Proc., §§ 261-540, 1940 ed., pp. 134-135). (Emphasis added.)

Since the test to be applied in determining whether a person has been convicted of a felony or a misdemeanor when he has violated a federal statute, is the punishment that *may* be inflicted and not what was *actually imposed,* it is manifest that the trial court was correct in allowing the introduction into evidence of the record of appellant Theodore's prior conviction.

Finally, appellants insist that the court erred in refusing to give to the jury certain instructions proffered by them. In this regard, it is urged by appellant Theodore who was charged in Counts II to VI of the information with the crime of grand theft, that the court refused to give certain instructions pertaining to theft. Appellant's apparent contention is that being charged with theft, and the crimes of larceny, embezzlement and false pretenses being now combined under the designation of theft, that "each of the theories requires a different quantity of proof," and that the court erred in refusing to give his instruction on the corroboration

required to sustain a conviction of theft by means of false pretenses. ▮ The first of the instructions offered pertains to corroboration required to sustain a conviction of theft by false pretenses as required by section 1110 of the Penal Code. This instruction was properly refused because the case was not prosecuted on the theory of false pretenses, but on the theory of embezzlement and larceny by trick or device, which fact is disclosed by the record.

▮ Neither embezzlement nor larceny by trick and device requires corroboration in accordance with the provisions of Penal Code, section 1110. (*People* v. *Stanley*, 58 Cal.App. 2d 310 [135 P.2d 414]; *People* v. *Tennant*, 32 Cal.App.2d 1, 10 [88 P.2d 937]; *People* v. *Pyle*, 44 Cal.App. 130, 132 [185 P. 1019].)

▮ Theories attain a value in a criminal case only to the extent that they are supported by substantial evidence (*People* v. *Temple*, 102 Cal.App.2d 270, 280 [227 P.2d 500]). The court instructed the jury upon the theories advanced by the prosecution and there is no contention that the theories upon which the case was submitted to the jury are not "supported by substantial evidence," nor is there any claim of error in the giving or refusing to give any instructions on the theories advanced by the prosecution.

▮ Appellants also predicate error on the refusal to give a requested instruction which, in substance, stated that the jury must unanimously agree upon the type of theft where the People rely on different theories, viz, embezzlement or larceny. The court, however, did instruct the jury that, "In order to return a verdict it is necessary that all twelve of the jurors agree to a decision." The court further instructed the jury: "It is *not* necessary that all of you agree as to which of the types of theft was committed, but it *is* necessary that all of you agree that the property was fraudulently appropriated by the defendant." Such further instruction stated the rule announced in *People* v. *Nor Woods* (1951), 37 Cal.2d 584, 586-587 [233 P.2d 897], that the jury must agree only that the property was fraudulently appropriated by the defendant. The rule in the Nor Woods case, *supra*, was followed in *People* v. *Chavez* (1951), 37 Cal.2d 656, 670-672 [234 P.2d 632], and in *People* v. *Waxman* (1952), 114 Cal.App.2d 399, 408-409 [250 P.2d 339]. Each of these last cited cases held that there is no merit in the contention now advanced by appellants.

Appellant Theodore further complains of the court's refusal to give his requested instruction pertaining to the rights of a partnership or joint venture to control the money and accounts in any manner connected therewith, without being guilty of theft. The court did, however, instruct the jury as to a joint venture, advising them that one joint venturer cannot be guilty of theft against another joint venturer. The instructions given on this issue were both correct and sufficient.

Finally, appellant Theodore urges that the court erred in refusing to give his requested instruction to the effect that it is a defense to embezzlement that the property was appropriated "openly and avowedly and under a claim of title preferred in good faith even though such claim is untenable."

This contention is without merit. As pointed out by respondent, "in no event could there be prejudicial error in refusing to give the last mentioned instruction pertaining to appropriating the money openly under a claim of title and in good faith, because, under the instructions as to joint venturers which were given at the request of the appellant Theodore, it was his theory that he and Mrs. Langendorf were in a joint venture. The court instructed the jury that one joint venturer cannot be guilty of theft against another joint venturer and if the jury finds from the evidence that the defendant was a joint venturer with Mrs. Langendorf they should acquit him. By bringing in a verdict of guilty, the jury disbelieved defendant's version of his dealings with the victim."

From a reading of all the instructions given, we are impressed that the trial judge correctly, fully and fairly advised the jury as to the kind, quantity and degree of proof necessary before appellants could be convicted of the offenses charged against them. This is all the law requires.

We are satisfied that no reversible error was committed, and the judgments and orders are therefore affirmed as to each defendant.

Doran, J., and Scott (Robert H.), J. pro tem., concurred.

Appellants' petition for a hearing by the Supreme Court was denied December 3, 1953. Carter, J., Schauer, J., and Dooling, J. pro tem., were of the opinion that the petition should be granted.