[Crim. No. 4450. Second Dist., Div. Two. Feb. 14, 1951.]

THE PEOPLE, Respondent, v. CHARLES P. TEMPLE et al., Defendants; THEODORE SANDROFF, Appellant.

Bernard Brennan for Appellant.

Fred N. Howser, Attorney General, and Gilbert Harelson, Deputy Attorney General, for Respondent.

McCOMB, J.—This appeal is from a judgment of guilty of (1) criminal conspiracy to cheat and defraud by criminal means, and (2) 24 counts of grand theft. There is also an appeal from the motion denying a new trial.

### Facts

The evidence disclosed principally through a witness Temple, an admitted accomplice of defendant, that the Bethlehem Pacific Coast Steel Corporation purchased its scrap metal through brokers, among whom were A-1 Iron and Metal Company, Eastern Iron and Metal Company and J. Levin & Sons.

When a driver of a truck loaded with scrap metal entered the Bethlehem company's gate he was required to stop and register with the guard on the gate. The records of the Bethlehem Company showed the broker through whom the driver was selling the metal, the license number of the truck, and the time the driver entered the plant as well as the time he left. After the driver was registered in at the gate he proceeded to the scale house where the truck was weighed to obtain the gross weight of the truck which was registered on the scale ticket. He then proceeded to the scrap yard where the scrap was unloaded with a magnetic crane. After unloading he went back to the scale house where the truck was weighed to obtain its weight after being relieved of its cargo.

The weighmaster then subtracted the empty weight from the gross weight to obtain the net weight of the metal. This information was transferred to a weight voucher in triplicate, the scale ticket being in duplicate. After these two records were completed the original of the scale ticket, the original of the weight voucher, together with the gate pass were given to the driver of the truck. At the gate he surrendered the pass and was registered out. The independent driver then took the weight tickets back to the broker who gave him a check for the amount of scrap set forth on the tickets. The following morning the weighmaster forwarded the duplicate of the scale ticket to the accounting department and the yellow copy of the weight voucher to the purchasing department.

Within about 10 days after delivery of scrap the broker was reimbursed for money paid the individual junk dealers. In addition the broker was paid a commission of fifty cents a ton.

The scales upon which the trucks were weighed at the Bethlehem Company were manipulated by hand so that it was possible to report a weight other than the true weight of the load. The scale ticket would register a weight that had been manipulated by hand. Since the office of the Bethlehem Company is open five days a week, weights recorded on Saturday could at the weighmaster's discretion be dated to be included in the business of the preceding Friday or the following Monday.

Mr. Charles P. Temple, from the latter part of 1946 through September, 1947, was acting as weighmaster at the Bethlehem scale house. Defendant was a partner in the A-1 Iron and Metal Company.

In February, 1947, defendant approached Mr. Temple asking him to issue fictitious weight tickets. In return for the issuance of such tickets to defendant, Mr. Temple received $1,970 in installments over a period of time. A scheme was worked out whereby defendant could unlawfully take money from Bethlehem Pacific Coast Steel Corporation. Mr. Temple, the weighmaster, at defendant's request issued fictitious weight tickets and gave them to defendant. These tickets carried the names of the drivers who had purportedly delivered the scrap to Bethlehem on which the tickets were based. The tickets also purported to show the name of the broker through whom the scrap was purchased.

Defendant took all the fictitious tickets upon which A-1 appeared as broker and had one Gagnon, buyer for A-1, issue a check for them in the name of the purported driver. Defendant cashed all these checks. Defendant gave all the fictitious tickets which showed Levin & Sons or Eastern Iron and Metal Company as brokers to Joseph Cohen. Cohen took these tickets to those brokers and obtained checks made out in the names of the purported drivers shown on the tickets. Either defendant or Cohen cashed all the checks of Levin & Sons and of Eastern Iron and Metal, but the proceeds all went to defendant. Sometime later Bethlehem would issue its check also based upon these fictitious tickets to the broker whose name appeared on the ticket. In reality the scrap for which Bethlehem issued its check was never delivered.

The guards posted at the Bethlehem gates at all times during the period of February, March, April and May, 1947, testified that the name of every truck driver who brought scrap into the yard appeared on the gate record without exception.

All the Bethlehem checks issued to A-1 Iron and Metal Company, Eastern Iron and Metal Company and Levin & Sons were cashed and the Bethlehem accounts at the banks on which the checks were drawn were debited. The brokers on all the tickets issued by Temple during the months of January, February, March and April, 1947, were A-1 Iron and Metal Company, Eastern Iron and Metal Company and J. Levin & Sons. L. Tate was the driver's name shown on the tickets issued for A-1 Iron and Metal Company. He testified that he never authorized defendant to endorse his name on any checks and that he never delivered a load of scrap to Bethlehem Pacific Coast Steel Corporation.

A handwriting expert testified that the name L. Tate appearing on the checks introduced in evidence, wherein L. Tate

was named as payee, was written by defendant. Similar evidence was introduced in support of each count in the indictment.

### Defendant's Contentions

■ First: *Defendant was convicted upon the uncorroborated testimony of his accomplice, Temple.*

This proposition is untenable. Temple's testimony that no scrap was brought in for the fictitious tickets is corroborated first by the guards and gate records of Bethlehem Steel. There were six guards posted at the gate of Bethlehem during the time the crimes were committed and each of these testified that the name of every truck driver who brought a load of scrap metal appeared on the gate record. The names Tate, Butler, Cohen and Gold do not appear on the gate records of Bethlehem on the dates upon which the scrap was supposed to have been delivered and each of the parties testified that he did not deliver the scrap set forth on the tickets to Bethlehem.

Further corroboration is found in the testimony of witness Nolan who said that defendant came through the Bethlehem gates four times on April 23, and received tickets 638, 645, 646 and 653. The fictitious tickets issued by Temple on April 23 were tickets 640, 641, 1521 and 1444. Mr. Nolan testified that the only A-1 drivers who came through with a load of scrap on April 23d were Mr. Felix whose load was rejected and a Mr. J. Thomas who delivered a load for A-1 but who received tickets 657 and 658. This evidence establishes with reference to the date of April 23 that neither defendant nor any of his drivers actually delivered any one of the four loads set forth on the fictitious tickets issued by Temple.

In addition defendant testified that he instructed Temple to issue the tickets in the names of Cohen, Tate, Butler and Gold, and admitted that Temple's testimony was correct in such respect. He also admitted that he received personally from Temple all the fictitious tickets, and that Mr. Temple's testimony was correct in that regard. He likewise testified that he took the tickets issued by Temple in the name of Tate and gave them to Mr. Gagnon, buyer for A-1 and had him make out checks in the name of Tate and that he then endorsed the checks and received the proceeds. He also admitted having received the proceeds from all the checks which were issued on the basis of the tickets issued by Temple in the names of Butler, Gold and Cohen.

The only respect in which defendant's testimony did not corroborate Mr. Temple's is wherein defendant stated that Bethlehem received the scrap represented on the tickets. Conceding that this portion of Mr. Temple's testimony was not corroborated, still there was sufficient corroboration of the accomplice's testimony to meet the requirements of section 1111 of the Penal Code.* It is not necessary that the testimony of the accomplice be corroborated as to every fact to which he testifies. It is sufficient if the corroborating evidence tends to connect the defendant with the commission of the offense. (*People* v. *Yeager*, 194 Cal. 452, 473 [229 P. 40] ; *People* v. *Griffen*, 98 Cal.App.2d 1, 26 [219 P.2d 519].)

It is clear that the evidence set forth above other than that of the accomplice Temple tends to connect defendant with the commission of the offenses as charged and constituted corroborative evidence of the accomplice's testimony.

 Questions as to the weight of the evidence and the credibility of the witnesses are for the trial court. The function of an appellate court is performed when the record discloses evidence aside from that of the accomplice which tends, as in the instant case, to connect defendant with the commission of the crime. (*People* v. *Henderson*, 34 Cal.2d 340, 346 [209 P.2d 785].)

 Second: *The trial court erred in refusing to permit defendant to present evidence as to his mental condition as an element to be considered by the jury to determine the weight and credibility to be given to defendant's testimony.*

This contention is also devoid of merit. On defendant's direct examination the following occurred:

"Q. By Mr. Neeb: Did you ever have any discussion with Mr. Temple concerning the giving to you of these tickets, these vouchers or any tickets or any vouchers for trucks that did not arrive at Bethlehem?

"A. No. The only discussion I had with Mr. Temple on this matter was using the fictitious name on these loads that arrived at the Bethlehem plant.

---

*Section 1111 of the Penal Code reads: ''A conviction cannot be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof. An accomplice is hereby defined as one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given.''

"Q. All right. Now, at that point, Mr. Sandroff, what was the reason—withdraw that. Did you have a reason for using the name of 'Tate' or 'Gold,' 'Butler' or 'Cohen' on these tickets?

"A. Yes, I wanted to get the money out of the partnership and keep it for myself.

"Q. Prior to doing this had there been any trouble between you and Williams?.

"Mr. Brandler: Now, just a moment——

"The Witness: Yes, there was.

"The Court: Just a moment, the answer may go out."

Defendant then offered to prove that there had been a long period of trouble between defendant and his partner culminating in defendant's trying to get money out of the partnership by using fictitious tickets and that this was the reason for doing what he had done.

Such evidence was clearly irrelevant and immaterial to any issue pending before the court. ■ Defendant's reasons or motives for performing an unlawful and criminal act are neither relevant nor material to any of the issues as to whether he had in fact committed such act or acts.

*People* v. *Taber,* 13 Cal.App.2d 27 [55 P.2d 1189], is clearly distinguishable from the facts in the present case. In the cited case the prosecution introduced evidence to show that defendant had employed one Bush to represent Rose who was charged with burning a building. This evidence was introduced for the purpose of corroborating the testimony of Rose and connecting defendant with the conspiracy and the arson. Defendant in the Taber case offered evidence to show his reason for employing Bush to represent Rose, which evidence was rejected, the court holding that this was error in such case. Defendant was not allowed to explain his reason for doing the acts.

■ In the instant case the evidence introduced by the prosecution showed that Mr. Temple at defendant's request issued 76 fictitious tickets. Defendant was allowed to explain by stating that his reason was to enable him to get money from the partnership for himself without his partner's being aware of it. In this case defendant was allowed to explain his acts while in the Taber case he was not.

Third. *The trial court erred in refusing to permit evidence that the testimony of the prosecution's witnesses was biased and prejudiced.*

This contention is not sound. ■ On cross-examination of the witness Temple, he testified that he knew that a civil action by Bethlehem was pending against him and that Bethlehem was waiting for the outcome of the criminal proceeding. His answers were stricken on the ground that it was a conclusion of the witness. This ruling was correct.

■ He was then asked if someone connected with the criminal proceeding had told him that Bethlehem was waiting for the outcome of the criminal case to learn what to do with the civil case. An objection to this question was properly sustained on the ground that it called for hearsay testimony. ■ He was then asked if anyone had asked him about it and an objection to this question was sustained on the ground that it was too speculative, whereupon defendant's counsel withdrew the question. Clearly defendant may not complain of the ruling in view of the fact that the question was withdrawn.

■ The witness was asked to tell where he got the information about the Bethlehem civil case's depending upon the outcome of the criminal case. An objection to this question was properly sustained on the ground that it was immaterial.

■ The law is established that where a question to which an objection is sustained does not itself indicate that the answer will be favorable to the party seeking to introduce the testimony, before the ruling will be reviewed on appeal an offer of what is proposed to be proven must first be made to the trial court so that the reviewing court may determine whether the evidence would be beneficial to the party offering it. (*People* v. *Ratten,* 39 Cal.App.2d 267, 270 [102 P.2d 1097].)

In the present case the question did not indicate that the answer would be beneficial or material to defendant, nor was any offer of proof made.

■ There is no merit in defendant's contention that he was not permitted to show the bias and prejudice of the witness Nolan. The record discloses that Nolan was examined relative to his knowledge of a civil suit pending against defendant and that motions to strike such testimony were denied.

Fourth. *The trial court erred in instructing the jury as follows:*

"The corroboration of the testimony of an accomplice required by law may not be supplied by the testimony of one or more other accomplices, but must come from *other evidence of circumstances* or from the testimony of one or more witnesses who were not accomplices." (Emphasis added.)

The foregoing is a copy of instruction No. 823 contained in California Jury Instructions, Criminal, page 649. Defendant contends that the italicized portion of the above instruction is contrary to the language of section 1111 of the Penal Code which provides: "A conviction cannot be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense *or the circumstances thereof* . . ." (Emphasis added.)

Defendant claims that the court charged the jury that evidence of circumstances was sufficient corroboration, whereas the code clearly states evidence of circumstances is entirely insufficient corroboration.

The correct interpretation of the Penal Code section is that evidence of circumstances is sufficient corroboration of the testimony of an accomplice. Such evidence tends in the instant case to connect defendant with the commission of the offense.

Fifth: *The court erred in refusing to give the following instructions requested by defendant:*

(a) "You are instructed that Count I of the indictment is a charge of conspiracy and the prosecution has elected to rely upon two different theories.

"One theory is that there was a conspiracy to commit grand theft by accepting payments for truck loads of scrap that were not delivered to Bethlehem.

"The second theory is that there was a conspiracy to receive payment for loads of scrap which were overweight at Bethlehem."

This proposition is likewise without merit. It is not the theory which the prosecution advances nor the theory which the defense adopts which governs the court in the giving or the refusing to give instructions. Theories are of value in a criminal case only to the extent they are supported by substantial evidence. (*People* v. *Wright,* 167 Cal. 1, 4 [138 P. 349].)

In the present case there is no evidence that the conspiracy to cheat and defraud was based only on overweights as contended by defendant. In stating that the only evidence introduced at the trial to substantiate the charge of conspiracy to cheat and defraud was that of the witness Duerden, who testified that he had given defendant overweight credit for scrap steel not delivered by him, defendant fails

to take cognizance of the conspiracy between Mr. Temple and himself which was also one to cheat and defraud. The refusal of the instruction was not error.

██ (b) "You are instructed that you are to disregard the testimony of the witness Spencer Duerdon because his testimony related only to the charge of a conspiracy to cheat and defraud by giving extra weight and there is no corroboration of such a charge."

The refusal to give this instruction was not error for the reason that the subject matter thereof was fully covered by the following instructions given at defendant's request:

"You are instructed that so far as Count I is concerned, the testimony of Spencer Duerden can be considered by you only upon the question of whether or not there was any conspiracy to cheat and defraud Bethlehem Steel Company."

"The testimony of Spencer Duerden is not sufficient, even if believed by you, to support the charge of a conspiracy to cheat and defraud by means of receiving *extra weight* on loads of scrap delivered by Theodore Sandroff to Bethlehem Steel Company."

██ Sixth: *The trial court was guilty of prejudicial misconduct during the trial.*

This proposition is untenable. After defendant on direct examination had stated that he wanted to get money out of the partnership and keep it for himself, the following occurred:

"Q. By the Court: In other words, what you are saying, Mr. Sandroff, is that you were willing to take this money from the partnership but you didn't take it from Bethlehem; is that it?

"A. That is correct.

"The Court: Well,——

"Mr. Neeb: Your Honor, I think that counsel would probably argue that there was no reason for this, and I think I should be permitted to show that there was.

"The Court: I don't know of any rule that permits a man to get on the stand and say why he committed a crime.

"Mr. Neeb: Well, let me ask him this:

"Q. Mr. Sandroff, did you feel that when you wrote on the back of these checks a name other than your own, that you were committing any offense?

"Mr. Brandler: Just a moment.

"The Witness: No

"Mr. Brandler: That is a question of law for the Court, and the jury to determine, not for this witness.

"The Court: Not what he feels is not a question of law, but it is immaterial. Is it any defense that he thinks he didn't commit a crime, if he committed a crime? He just said he was willing to take the money from his partner.

"Mr. Neeb: There is a legal question whether there can be any crime insofar as financial arrangements between partners is concerned.

"The Court: I am going to sustain it as immaterial. I don't know of any rule that permits a self serving statement by an individual that he had a reason for committing the crime.

"Mr. Neeb: Your Honor, may I ask, with all due respect to your Honor, that the jury may be instructed not to heed your Honor's remark that there has been any crime committed?

"The Court: Well, that of course is immaterial, whether there was or wasn't. The jury is admonished to disregard any inference from anything the Court has stated as to whether or not a crime has or has not been committed with which the defendant is here charged."

Defendant may not here urge error in the court's comment for the reason that it is the general rule that a defendant in a criminal prosecution waives objection to the court's erroneous remarks where he neither moves to strike such remarks nor requests the court to admonish the jury to disregard the alleged prejudicial remarks. (*People* v. *O'Brand,* 92 Cal.App.2d 752, 756 [207 P.2d 1083].)

In the present case defendant made no objection to the remarks of the trial judge nor did he assign them as misconduct, nor request that the jury be instructed to disregard them. Therefore the foregoing rule is here applicable.

Even though defendant did not comply with the above rule, the trial judge did admonish the jury to disregard any reference that he had made which would indicate that he thought defendant had committed a crime, and we must assume that the jury followed such admonition. (*People* v. *Horowitz,* 70 Cal.App.2d 675, 694 [161 P.2d 833].)

■ Seventh: *The district attorney committed prejudicial misconduct during the course of his argument to the jury.*

This contention is also untenable.

(a) During his argument to the jury defendant's counsel made the following statement:

". . . if it shall become the practice in our courts of these United States, not only just to bring parties in and place

them in the shadow of the penitentiary upon that kind of evidence, but if it should become the rule that men or women would be deprived of life or liberty upon that kind of evidence, . . .''

Thereafter in the district attorney's final argument he said: ''Now, with reference to the argument of Mr. Neeb, the matter of punishment is not a matter for the determination of the jury. And I believe the court will so instruct you, that that is a matter that the court must ultimately decide upon. Mr. Neeb, however, in his effort to prevail upon your sympathies, mentioned something about the matter of the punishment of Mr. Sandroff, and only by reason of that statement of Mr. Neeb's, which is in the record in this case, dealing with the subject matter of punishment, I feel impelled to discuss that matter for just a moment.

''Now, I caution you again, of course, that the matter of punishment is not a matter for your decision or your determination. That rests exclusively with the court. What did Mr. Neeb say in his final argument, among the very final words, for the purpose of prevailing upon your sympathies? Mr. Neeb says that 'The District Attorney in this case would place the defendant Sandroff in the shadow of the penitentiary.' Those are his words. I took them down myself.

''Now, as far as the matter of punishment, I say again that is not a question for you jurors to determine. But in the event that you jurors return a verdict of guilty as to the defendant Sandroff, there is no assurance, no guarantee, there is no rule of law by which the court's hands are tied so that the court has no other alternative but to sentence Mr. Sandroff to the penitentiary. The matter of the punishment, as far as the defendant Sandroff, would rest entirely in the sound discretion of Judge Barnes after a review and analysis of all facts and circumstances. The court could, if the court saw fit—and of course, we don't know what the action of the court would be—the court could, if the court saw fit, place the defendant Sandroff on probation.''

Upon defendant's objecting to the district attorney's comment the court said to the jury: ''The jury will be instructed at the proper time that the matter of punishment is of no moment and should not be considered by them in any way in determining the guilt or innocence of any of the defendants.''

Thereafter the jury was instructed thus: ''In arriving at a verdict in this case the subject of penalty or punishment is not to be discussed or considered by you, as that matter is

one that lies solely with the court and other governmental agencies, and must not in any way affect your decision as to the innocence or guilt of the defendants.''

. The court's instructions to the jury were adequate and removed any prejudicial effect of the district attorney's argument.

(b) Defendant also contends that it was reversible error for the district attorney to make reference to the failure of defendant's wife to take the witness stand. She was a codefendant in the trial and was acquitted. The record shows that the references of the prosecution to the failure of defendant's wife to testify were made in regard to her as a defendant and no remarks were made as to what effect her failure to testify had on defendant.

It was proper for the prosecution to comment on her failure to explain or deny by her testimony any evidence or facts in the case against her. (*People* v. *Adamson*, 27 Cal.2d 478, 487 et seq. [165 P.2d 3].)

*People* v. *Heacock*, 10 Cal.App. 450, 456 [102 P. 543], relied on by defendant, is not here applicable for in the cited case defendant's wife was not a codefendant, and the remark as to her failure to take the witness stand and testify was made not in reference to her but with reference to her husband, the defendant.

(c) Defendant's claim that the district attorney committed prejudicial error in making reference in his argument to defendant's connection with his partnership will not be considered for the reason that defendant did not make a motion to strike, object to or ask the court to admonish the jury to disregard such reference.

It is the general rule that any objectionable argument of the prosecuting attorney must be objected to at the time it is made and the court requested to admonish the jury concerning it before this alleged error may be urged on appeal. (*People* v. *Codina*, 30 Cal.2d 356, 362 [181 P.2d 881].)

Eighth: *The court erred in denying defendant's motion for a new trial on the ground of newly discovered evidence.*

This proposition is without merit. Defendant claimed that after the trial he discovered a number of Bethlehem weight vouchers and scale tickets which were material to his defense. There is no showing of due diligence upon the part of defendant to secure the alleged newly discovered evidence. During the course of the trial the prosecuting attorney made the

following statement to defendant's counsel, "All of those scale tickets, gate records, and weight vouchers are all available to you, Mr. Neeb, as well as other counsel."

It thus appears that the evidence was available to defendant at all times and that he did not show on his motion for a new trial due diligence in discovering the alleged newly discovered evidence. Therefore the trial judge in denying the motion on such ground acted properly. (*People* v. *Yankee,* 79 Cal.App.2d 431, 437 [179 P.2d 582].)

The judgment and order are and each is affirmed.

Moore, P. J., and Wilson, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied March 15, 1951.