[Crim. No. 5371.   Second Dist., Div. Three.   Mar. 23, 1956.]

THE PEOPLE, Respondent, v. SIDNEY BLAU et al., Appellants.

Murray M. Chotiner, Albert Jack Chotiner and Russell E. Parsons for Appellants.

Edmund G. Brown, Attorney General, and Martin M. Ostrow, Deputy Attorney General, for Respondent.

SHINN, P. J.—Sidney Blau, Sidney Fisher, Joseph Mays and Mike Meceirow were accused by information of criminal conspiracy in that they did conspire with each other and with Joseph A. Ricca, William Vincent Johnston, Kenneth K. Olson, Richard G. Coston, Edward L. Waymire, Jerry Goddard, Edward Butterfield and Jerry Wells to commit theft in violation of section 484 of the Penal Code and "falsify corporate records" (not naming the corporation) in violation of section 3020, subdivision (b) of the Corporations Code. By Count II of the information they were accused of grand theft on or about October 1, 1953, and by Count III of grand theft on or about December 7, 1953, in the taking of money from Andrew Brown Company, a corporation. The alleged conspirators other than Blau, Fisher, Mays and Meceirow were not accused of any offenses by the information. In due course the cause came on for trial. On July 27, 1954, certain proceedings were had in Department 44 of the superior court respecting a proposed submission of the cause on the transcript of the preliminary hearing and for waiver of a jury trial; the waiver of jury trial and consent to submit the cause on the preliminary transcript was vacated on motion of the People and the cause was set for trial to a jury; the cause was tried and submitted; a verdict was returned finding Meceirow not guilty; there being no verdict as to defendants Blau, Fisher and Mays and upon stipulation of counsel a mistrial was declared and the cause was retransferred to Department 44 for resetting; it was assigned to Department 46 for trial to a jury and in that trial Mays was acquitted and Blau and Fisher were convicted of violation of Count I of the information as charged and of petty theft as charged in Counts II and III of the information. They made a motion for new trial which was denied and they appeal from the judgment and the order denying their motion for a new trial.

The first contention of the appellants to be noticed is that the only substantial evidence against them was the uncorroborated testimony of witnesses who were accomplices and who were named as coconspirators although not charged as defendants. It is not questioned that the conduct and state-

ments of the appellants as described by these witnesses were sufficient to constitute the offenses of theft and conspiracy to commit theft.

Blau and Fisher were brothers-in-law. From 1946 Blau had operated a company called American Drum Company, hereinafter called American. His business was the buying, selling and servicing of steel drums. With Fisher, Blau also operated a cafeteria in the civic center in Los Angeles. Fisher left this business in 1952 and went to work for American. The company had 50 or 60 customers and handled many thousands of drums in a year's time. To one customer alone, Pioneer Flintkote, it sold in 1952 between 9,000 and 10,000 drums. Its servicing business consisted of cleaning and repainting drums, and was conducted on a large scale. It was constantly buying drums wherever they could be obtained. Its purchases were made in part through its drivers and from peddlers. The drivers were furnished with $50 each morning and bought drums for cash. The prices ranged from $1.00 to $3.00 or $4.00. Drums were sometimes acquired in small numbers from businesses that wished to get rid of them and made no charge for them. Purchases in large numbers were made when the same were available. American was in sharp competition with H. Levine Cooperage Company, hereinafter called Levine, which was described as one of the largest cooperage companies in the country and which also bought, sold and processed drums. It was the duty of Levine's drivers to purchase drums. Both Blau and Fisher were active in the operation of their company. Fisher attended to most of the office work and Blau had control of the money. The evidence of the People consisted principally of testimony of employes of Levine and of customers of American. These witnesses had confessed to peculations from their employers and they implicated Blau and Fisher and American's drivers, Mays and Meceirow, in numerous transactions. Generally speaking, these witnesses testified to having cheated their employers by buying drums upon the credit of Levine and selling them to American, by delivering to American more drums than were receipted for and by giving receipts for more drums than were delivered by American to the concerns for which the witnesses were working as purchasing agents or receiving clerks. They testified that in all these transactions they were given money by Blau, Fisher or their drivers for each drum lost to their employers through their various methods of cheating. Several of the witnesses testified that these schemes originated with Blau and that Fisher had

knowledge of the same and participated directly in some of the transactions. Others testified their arrangements were made with Mays or Meceirow.

No contention is made that the testimony of the accomplices with respect to the fraudulent scheme was incomplete in any respect. The crucial question is whether there was evidence sufficient in law to establish guilty knowledge and participation in the thefts or any of them on the part of Blau and Fisher. ■■ We have concluded that there was sufficient evidence to establish the necessary corroboration of the testimony of the accomplices.

Many witnesses testified and the record is voluminous. It would serve no good purpose to state the testimony of the conspirators at length. The substance of their testimony will be stated. The matter of corroboration will be discussed later.

Jerry Goddard testified that commencing in April, 1953, he was a buyer of used drums for Levine. In August, in the presence of his brother-in-law, Waymire, Mays and Meceirow, Blau suggested that he (Goddard) could make some money on the side and that he and Waymire could each make as much as $5,000 a year and that Waymire would explain to him how it could be done. He learned from Waymire what Blau meant. He (Goddard) purchased 98 drums which he charged to Levine and upon instructions from Blau delivered them to the Garfield dump; he telephoned Fisher who said there would be a driver there to pick them up; Mays met Goddard at the dump, hauled the drums away and he (Goddard) received money from Waymire. In October Blau requested more drums. In November Goddard left 45 drums at the dump; these had been purchased on Levine's credit; November 28 he drove to the dump with 77 drums which he had purchased for Levine's account. He telephoned Fisher, who arranged to have the drums picked up. He received money from Waymire. Shortly thereafter Goddard when accused by detectives and police officers admitted his dishonest transactions with American. December 17 at the request of one Duber, a detective employed by Levine, Goddard called Blau and told him he had some more drums; Blau replied that he had better lay off because he, Blau, had discovered a "bug" in his office and that things were hot and for Goddard to take the drums back to the Levine plant. On the same day Goddard left 68 drums at the dump and notified Fisher. He told Mays over the telephone where the drums had been left and Mays said he would pick them up. He went with Waymire to American

where Waymire collected $108 from Blau which he turned over to a Mr. Forbes, a district attorney investigator.

Waymire was employed as shipping clerk for Levine. He testified that during a former employment with Andrew Brown Company he had furnished drums to Blau, had been paid for them and divided the money with one Wells and one Butterfield. In July or August 1953, while employed by Levine, he discussed with Blau the subject of taking drums from Levine to American Drum; they would be left at a place where American could pick them up. He met again with Blau and Fisher and they arranged to have the drums left at the Garfield dump; Blau took Waymire to the dump. He collected from American $180 for the drums which Goddard had delivered on September 23 and he divided with Goddard. In October he and Waymire met Blau at the latter's home. Blau wanted him to bring more drums. In November Waymire discussed the delivery of drums with Blau and Fisher; he received money for the drums, which he divided with Goddard. On December 17 he went to American's office to see the defendants; Fisher pointed to the ceiling where the ''bug'' had been discovered. He (Waymire) was paid $108 for the drums that had been left at the dump and this money was turned over to Mr. Forbes.

One Ricca testified that he was an employe of the California Extraction Company and in charge of the purchase of drums. In July 1952 Mays suggested that if he (Ricca) was short of money something could be worked out on drums. Mays discussed the matter of Ricca's buying drums in July and September 1953 and promised Ricca $1.25 for every drum he signed for that was not delivered. On November 20 Ricca called Mays and asked for a full load of drums, telling him to make out a ticket for 140 drums and to bring only 60. Mays brought a delivery slip for 140 drums and $100 in cash. Ricca receipted for the drums and received the money. December 14 Ricca called Mays and asked for 120 drums and said he would sign for them. He went to American's office, signed a delivery slip for 120 drums and received from Fisher $150. December 17, after Ricca had admitted his thefts, he called Mays and asked for a delivery ticket for 120 drums. Mays drove in his truck, gave Ricca a receiving ticket for 120 drums and $150 in cash; Ricca signed the delivery slip. After his thefts had been discovered by his employer he went to American where Blau offered to give him the money to pay for the drum shortage and wanted Ricca to call Mr. Jerome,

owner of Ricca's company, and arrange with him to make a deal which Blau said would clear Mays of any conspiracy.

One Johnston testified that he was foreman of Pioneer Flintkote, handling drums. In February 1953 Mays told him he could make some extra money by shipping out more drums to American for cleaning than were receipted for and that he would be paid for those extra drums. In April 1952, 10 more drums were put on Mays' truck than were receipted for and he was paid money. In September 1952 Johnston borrowed $300 from Blau who said it would be repaid in similar drum transactions. In January and February 1953 Mays picked up a load of drums for which no confirmation was given. Johnston went to see Blau, saying it was too many drums to go out at once, but Blau insisted the shortage would not show up and said to let the matter stand and it would finish paying off Johnston's debt of $300. In May 1953 Fisher paid Johnston $15 to cover a shortage of 10 drums and later Johnston was paid $15 for another shortage of 10 drums. Johnston gave a receipt for a delivery on November 24, for 134 drums, when 124 were delivered and a receipt for 108 drums when only 100 were received. For the shortage of 18 drums Fisher paid Johnston $27. Between April 1952 and September 1953 there were 18 or 20 such transactions involving drums coming into or going out of Flintkote and Johnston was paid for all the shortages by either Mays, Fisher or Blau. December 3, American took another truck load without confirmation slip. On the following day Blau paid Johnston $165. A few days later Johnston borrowed $100 from Blau and arranged that it was to be repaid through similar drum transactions.

One Olson handled drums for W. P. Fuller Company. In May 1953, Meceirow, making deliveries for American, presented to Olson two receipts, one for 10 more drums than the other. When Meceirow explained that Olson would be paid for signing the receipt for the greater number, he signed a slip for 33 drums although only 23 were delivered, and was given $20 by Meceirow. November 12 Olson had 90 drums loaded on Mays' truck and Mays signed a receipt for only 84 drums and paid Olson $6.00. There were four or five other similar transactions in which Olson was paid $1.00 to $2.00 a drum. He testified that altogether there were shortages amounting to 100 or 125 drums; sometimes he received $1.00, sometimes $2.00 per drum; the total amount he received was around $150 but he signed a note to Fuller's bonding company for $500.

One Coston was the receiving clerk for Arco. In the fall of 1950 Blau asked him if he would sign delivery receipts for drums not delivered by American for which he would be paid. After this he signed fictitious delivery slips in Blau's office and was paid in cash. From the fall of 1950 until around Christmas 1951, he was paid for approximately 35 transactions involving shortages of drums in American's deliveries. After an interval in which no business was done with American and between February and November 1953 there were about 25 more shortages of drums in American's deliveries for which Coston was paid. On December 16 he received from Meceirow $60 for a shortage of 40 drums. After Coston's thefts had been discovered he had a telephone conversation with Fisher January 18, 1954. Fisher informed Coston, who was living in Las Vegas, that Blau and Mays were coming to see him. They went to Las Vegas, discussed the matter with Coston and told him his confession amounted to nothing because it was given under intimidation.

Edward Butterfield was receiving clerk for Andrew Brown Company from April to December 1953. During a previous term of employment he had had a conversation with Blau in the summer of 1951 in which it was arranged that Butterfield would be paid for shortages in deliveries of drums. There were about two shortages during the summer of 1951. Butterfield left the employ of Brown in October 1951 and returned in April 1953. Between April and December 1953 there were five or six transactions involving fictitious delivery slips signed by Butterfield when no deliveries were made, for which Butterfield was paid $750. He testified that these delivery slips were typed by Fisher either at Blau's or Fisher's apartment and on a black portable typewriter. Butterfield was paid from 50 cents to $1.00 per drum. Yellow copies of the receipts were put in Brown Company files. Brown Company paid for all these fictitious deliveries, the slips of which were identified by Butterfield. One receipt dated December 16, 1953, was for 24 drums when only 20 were delivered. The shortage was discovered by an accountant. American was called on the telephone; Fisher explained that it was a typographical error and it was corrected. Butterfield's thefts were discovered in December 1953.

There were introduced on behalf of the People numerous exhibits identified with many of the drum transactions. One was a charge slip showing the purchase on Levine's account of 77 drums which Goddard testified he sold to American.

Another was a charge slip for 98 drums also delivered to American by Goddard and two receipts, one showing the purchase of six drums and the other seven drums on Levine's account. Numerous delivery slips were identified and placed in evidence. Of these it may be said, generally, that they corroborated the testimony of the several witnesses that they had issued such receipts. There was a receipt signed by Ricca November 20 for 140 drums; a receipt for 120 drums signed by Ricca December 14 and another receipt for 120 drums; a receipt dated November 20 signed by Obrite for 140 drums, one dated December 16 for 20 drums and one dated December 17 for 120 drums, one dated September 4, 1953, for 12 drums, another of the same date for 68 drums which was signed by Johnston; a receipt dated November 24 for 25 drums and one of the same date for 109 drums signed by Johnston. There was a record made out by Coston indicating the receipt of 100 drums on November 17 and another record of a delivery of 37 drums on November 30; and a record calling for 100 drums to go out December 16 when, according to Coston, 140 drums were delivered to American; also another record calling for delivery of 100 drums to Arco on December 17. Butterfield identified typed delivery slips which he testified were fictitious and which indicated deliveries to Andrew Brown Company. These bore dates from October 2, 1953, to December 12, 1953, and were 12 in number, also checks of Brown Company showing payments for these deliveries. There was another delivery ticket dated December 16 showing a change from 24 drums to 20 drums which was corrected by American. The delivery tickets furnished corroboration of the testimony of the accomplice witnesses that receipts had been given evidencing the delivery to the employers of the witnesses of certain numbers of drums although there was nothing upon these receipts and records to indicate that the numbers of drums receipted for had not been delivered on the several dates on which the receipts were issued.

The records of Levine Company were corroborative of the testimony of Goddard that the 77 drums and the 98 drums, which he testified were delivered to American, were the property of Levine. In addition to the foregoing evidence testimony was given by detectives employed by Levine. One Duber was employed to investigate Levine's transactions with American some time in October, 1953. He testified that on November 28 he fellowed a Levine truck driven

by Goddard to the Garfield dump. There were 77 drums on the truck. On the way Goddard had stopped and made a phone call. He saw the 77 drums transferred to an American truck from the Levine truck and saw the American truck return to the American yards.

On December 15 Goddard was interviewed by Coker, a detective in the employ of Duber, and by two police officers, and confessed his thefts. Don M. Forbes, an investigator from the district attorney's office, testified that on December 17 he saw Goddard leave the Levine plant with 68 drums which he took to the Garfield dump, that he saw them picked up by Mays driving an American truck on December 22 and saw the American truck with the drums return to the American plant; on the same day he searched Waymire's pockets and took what money he had; saw Waymire enter the American office around 6 p. m.; looked through a window and saw Waymire, Blau and Fisher; Blau put what appeared to be money on the desk in front of Waymire who picked it up and put it in his pocket; 5 minutes later he met Waymire at Atlantic and Florence and received $108 from him.

Coker testified that on November 17 he saw an American truck loaded at the plant with 50 black drums; he saw the truck enter the yard of Arco, a customer of American and leave empty 10 minutes later. He did not identify the truck driver. He also testified that on November 20 he saw an American truck driven by Mays arrive at California Extraction Company with 60 drums. He did not see Ricca. Forbes testified that on the morning of December 17 he saw Mays driving an empty American truck into California Extraction; Mays handed Ricca something on which Ricca wrote; Mays gave Ricca a piece of paper and two other objects; after Mays left, Ricca gave him (Forbes) a delivery receipt for 120 drums, a calendar and $150 cash.

Coker also testified that on November 12, 1953, he saw an American truck fully loaded with 140 drums leave the W. P. Fuller Company plant and that on November 24 he saw an Ameriacn truck loaded with 124 drums go to Flintkote but did not count the drums at Flintkote. On November 20 he saw the truck take 100 drums from American but did not recognize either of the drivers.

Forbes testified that he listened in on the phone in December when Goddard was talking with Blau and Mays and his testimony corresponded with that of Goddard with reference to those conversations. His testimony was the same as

that of Waymire as to the conversations with Blau respecting the 68 drums.

Butterfield identified a number of delivery slips, which he testified were fictitious. These were written by Fisher on a black portable typewriter on American delivery ticket forms. He had signed them and returned the yellow carbon copy to Andrew Brown Company; Blau kept the originals. B. P. Yanez, an investigator for the district attorney's office was shown a black portable typewriter and testified that he first saw it at Fisher's residence on March 2, 1954. He identified a standard type typewriter as one he had first seen at American's office February 26 or 27, 1954. Donn E. Mire, an examiner of questioned documents, employed by the district attorney, testified that a delivery ticket Number 3785 was typed in part on the portable and in part by the standard typewriter and that six other exhibits shown him, all relating to the Andrew Brown account, were typed in part or in whole on the black portable typewriter and other portions on the standard typewriter. There was evidence that all the delivery tickets typed on the portable typewriter were fictitious.

Defendant Fisher testified that he went into the drum business with Blau in 1952, invested no money but was to get a share of the profits. He drew $75 per week which was raised to $125 when he gave up working in the cafeteria. His duties with the company included buying materials and supplies, buying drums from peddlers, hiring and firing; he had charge of the office, assisted with the books and payroll, handled calls and made deliveries. Sometimes when the girl in the office was busy, he would make out delivery tickets on the portable typewriter; at times they would be commenced on one typewriter and finished on another. There were times when several delivery slips would be signed to correspond with several orders although there would be but one combined delivery.

As we have mentioned, there was no standard price for drums but the amounts given to employes of the customers in cases of shortages were below the value of the drums. Goddard testified that the 98 drums he delivered to the dump on September 23 were charged to Levine Fiber Company at $2.00 apiece or $196, and that he received as his half from Waymire $90 or $95. The 45 drums he took to the dump on November 27 were bought for $82, 25 at $2.00 apiece, and 20

at $1.60 apiece and they were charged to Levine. The 77 drums he delivered on November 27 were purchased at $1.50 each, or a total of $115.50. He received from Waymire as his share from the sale of the 45 and the 77 drums $80 or $90. He did not question Waymire as to the difference between the cost of 98 drums and the supposed selling price. He received for all the drums taken from Levine the fair market price of the drums. He reported none of his receipts in his income tax returns. As to the prices paid by American Waymire's testimony was substantially to the same effect. Neither Goddard nor Waymire kept any account of the moneys they received. They approximated those amounts.

Butterfield testified that he received $1.00 or $1.50 for each missing drum in deliveries to or from Andrew Brown Company. He testified some reconditioned, used, thinner drums were worth $4.50 each. It was these drums that were covered by the fictitious transactions. Some drums that needed reconditioning were worth $3.25 each.

In the foregoing recital we have not stated all the evidence that was corroborative of the testimony of the accomplices nor have we recited all the testimony which they gave with respect to their direct dealings with appellants. Considered by itself, the testimony of the accomplices could not be deemed sufficient to establish the existence of a conspiracy with the appellants or Mays and Meceirow. As we have stated, there was no direct evidence other than the testimony of the accomplices fastening upon appellants' knowledge of the thefts. There was direct corroboration as to comparatively few of the many transactions to which the accomplices testified. But this evidence, as we shall see, was sufficient when considered with the indirect evidence not only as corroboration of the testimony of the accomplices as to the existence of a conspiracy but also of their testimony of the knowledge of appellants of the scheme and their participation therein.

As previously mentioned there were many exhibits consisting of delivery tickets, originals and copies, which corresponded with the testimony of several of the accomplices with respect to receipts which they had given or received. We shall mention but a few of them.

Coker testified that on November 17 he witnessed the loading of an American truck with 50 drums which were taken to Arco. An exhibit received in evidence was a record of Arco made out by Coston showing receipt by Arco of 100 drums. Coston had testified to this effect. Coker also testi-

fied that on November 20 he saw 100 drums loaded at American for delivery to Flintkote. An invoice and delivery slips were introduced in evidence showing receipt of 108 drums by Flintkote. On November 24 Coker watched an American truck being loaded with 124 drums and followed it to Flintkote where they were delivered. Flintkote's delivery receipts were issued for 134 drums. There were other receipts which Johnston testified were for 8 more drums than were delivered. This evidence was corroborative of the testimony of Johnston that there was a shortage of 18 drums in the two deliveries for which he was paid $27 by Fisher. Coker also testified that on November 12 he saw 90 drums loaded at Flintkote by American. Flintkote's record showed that a receipt was given for only 84 drums. He also testified that on November 20 he saw 60 drums loaded at American, for delivery to California Extraction where delivery was made. A delivery slip in evidence was a receipt on that date for 120 drums. Ricca had testified that in this transaction in which only 60 drums were delivered, he was paid $100 for the ones that were missing. Forbes testified that on December 17 he saw Mays drive into California Extraction in an empty American truck, saw him hand Ricca something on which Ricca wrote, saw him give Ricca a piece of paper and two other objects and that after Mays left Ricca gave him (Forbes) a copy of the delivery receipt for 120 drums and $150 in cash. There was convincing evidence of the existence of a conspiracy.

The corroborative evidence with respect to the guilty knowledge of appellants must be weighed in view of the fact that Levine, Brown Company, Arco, California Extraction, Fuller Company and Pioneer Flintkote had been systematically defrauded in their dealings with American. The testimony of Coker and Forbes, considered with the documentary evidence, substantially corroborated the testimony of the seven employes, Goddard, Waymire, Butterfield, Ricca, Olson, Coston and Johnston, who represented their companies in dealing with American, as to the existence of a concerted plan of theft. And these seven men who had been corrupted by some representatives of American had confessed their wrongdoing. The appellants say that if there were thefts from American's customers they had no knowledge of it, which, if true, would fasten the entire blame on the drivers Mays and Meceirow. This is not a reasonable explanation. When Goddard delivered drums to the dump they were sold to American, not to Mays or

Meceirow. When there were shortages in American's deliveries the customers paid American, not Mays or Maceirow, for drums for which they had receipted but had not received. There were necessarily countless discrepancies between American's records and the number of drums on hand. A few might have gone unnoticed but in the multitude of instances of pickups in excess of numbers receipted for and numbers receipted for in excess of those delivered the inventories of American as shown by count would have vastly exceeded in the aggregate the numbers on the records.

Fisher had charge of the delivery and receipt of drums. The delivery slips typed on the typewriter which he used were identified as fictitious. None was genuine. It is scarcely conceivable that he could have remained in ignorance of the discrepancies between the numbers of drums brought into or taken from the plant and the receipts signed by American's drivers or the receiving clerks of the customers. Neither is it conceivable that Fisher, who owned no interest in the business, was consistently fleecing its customers unknown to Blau.

In addition to the evidence relative to shortage in deliveries the transactions with Goddard and Waymire disclosed the eagerness of appellants to obtain drums wherever they might be had, even from employees of Levine whom they knew to be under suspicion.

Appellants contend that they believed the drums purchased from Goddard had been purchased by him and Waymire for resale and did not suspect that they had been purchased on Levine's credit. There was no direct evidence that they knew the drums did not belong to Goddard and Waymire. There were, however, circumstances which tended to disprove their assertions of innocence. By prearrangement, exchanges from Levine trucks to American trucks were made at the Garfield dump. Defendants knew it to be the practice for drivers to purchase drums for their employers and that Goddard and Waymire were working for Levine. They say they adopted the furtive method of exchange because they wished to conceal the transactions from Levine, knowing it was the duty of Goddard and Waymire to give Levine the benefit of their purchases. They knew Goddard and Waymire were unfaithful to their employer and they knew that for their unfaithfulness they sought some personal advantage. They did not claim they inquired why Goddard and Waymire would sell drums to them instead of taking them to the Levine plant, nor did they

investigate Goddard's claim of ownership. It was less apparent that they trusted to the honesty of the men they were dealing with than that they were indifferent as to how far their dishonesty might go. The jury could have believed with good reason that defendants were encouraging Goddard and Waymire in their dishonesty and willing to profit by it. The stealthy and sordid methods employed by appellants, in which they saw no wrong, was indicative of their standards of business integrity.

We have stated the substance of the corroborative evidence and that we deem it sufficient in law. The test of sufficiency is stated in section 1111 Penal Code. It is ''A conviction cannot be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof.''

█ It has been stated frequently that even slight evidence is sufficient if it tends to connect the defendant with the commission of the offense. This, of course, does not mean evidence that raises merely a suspicion, even though a strong one, of connection with the offense. (*People* v. *Davis,* 210 Cal. 540 [293 P. 32].) █ At least as a guide to a reviewing court, judging the sufficiency of corroboration, the rule is that the corroborative evidence is sufficient if it ''tends to connect the defendant with the commission of the crime in such a way as may reasonably satisfy the jury that the witness who must be corroborated is telling the truth,'' and in determining this question the corroborative evidence must be considered without the aid of the testimony which is to be corroborated and it is not sufficient if it requires the interpretation and direction of such testimony in order to give it value. (*People* v. *MacEwing,* 45 Cal.2d 218, 224 [288 P.2d 257].) █ It is, of course, well settled that there is no need for corroboration of the entire testimony of an accomplice. (*People* v. *Temple,* 102 Cal.App.2d 270 [227 P.2d 500].)

In the present case, the jury having found the corroborative evidence to be sufficient to connect appellants with the commission of the offense of conspiracy to commit theft, the question we have answered is merely whether the evidence reasonably justified that factual conclusion. It would be futile to attempt a comparison of the evidence in the present case with that in other cases which involved the sufficiency

of corroborative evidence. The facts of our case are unique. We have already stated our reasons for holding that the implied finding of the jury was a reasonable conclusion with respect to the existence of the conspiracy; upon that issue the independent, direct evidence, to say nothing of the circumstantial evidence, furnished strong corroboration of the testimony of the accomplices. It was firmly established that there was a conspiracy between the representatives of American and the employees of the customers who were systematically defrauded. The representatives of American, parties to the conspiracy, were Blau, Fisher, Mays and Meceirow, or some of them. The corroborative evidence which tended to connect Blau and Fisher with the conspiracy also implicated Mays and Meceirow but was wholly inconsistent with the claim that only the latter two could have been the conspirators on the side of American. Although the independent evidence which tended to implicate Blau and Fisher was circumstantial, it was convincing, and it pointed to them as the principals and ringleaders more logically than to the drivers who were acquitted by different juries. And this being true, and the corroboration being legally sufficient, the added testimony of the accomplices with respect to the direct and active participation of appellants in the unlawful scheme furnished satisfactory evidence of their guilt.

In an elaborate argument appellants call attention to particulars in which the testimony of the accomplices was contradictory and to the facts that most of them were retained in their employments and were not prosecuted, claiming that they were offered inducements to give testimony favorable to the People. The argument also dwells upon the explanations and the denials uttered by appellants. ██ But counsel must realize that in passing upon the sufficiency of the evidence a reviewing court must give it the effect most favorable to the validity of the judgment. The case long since passed the stage when the credibility of the witnesses was in issue.

██ The second contention of appellants is that the evidence was insufficient to prove the offenses of petty theft, being lesser offenses necessarily included in the offenses of grand theft charged in Counts II and III of the information. The offenses were alleged to have been committed on or about October 1 and December 7, 1953. It is argued that the evidence as to these offenses consisted entirely of the testimony of Butterfield, an admitted accomplice. The evidence which tended to furnish corroboration of his testimony included

receipts signed by him which have already been referred to and we hold it to be sufficient.

As previously mentioned appellants were charged in Count I with conspiracy to commit two crimes, namely, theft and falsification of corporate records. Although the evidence justified the verdict with respect to a conspiracy to commit theft it was insufficient, in our opinion, to establish a violation of or conspiracy to violate section 3020, subdivision b, of the Corporations Code. An affirmance of the judgment without mention of our views as to the insufficiency of the evidence to prove violation of that section would imply approval of a judgment based upon a verdict which we deem to be partly in error. Moreover, since we believe the conspiracy proved was one for the commission of a single crime and not two crimes it would seem that the appellants have a right to an expression of our views. Section 3020, subdivision (b), reads as follows: "Every director, officer, agent, or shareholder of any corporation, domestic or foreign, who, with intent to defraud, destroys, alters, mutilates, or falsifies any of the books, papers, writings, or securities belonging to the corporation, or makes or concurs in making any false entries, or omits or concurs in omitting to make any material entry in any book of accounts or other record or document kept by the corporation is guilty of a public offense." The section deals with two subjects, first, the records of the corporation and second, with the matter of keeping accounts. ■■■ In our opinion "the books, papers, writings or securities belonging to the corporation" would embrace those held in ownership of some permanency, such as a corporation would be required to keep in order to maintain a true record of the condition of its affairs. All these would belong to the corporation. We think it is clear that it was not the intention to include as writings belonging to the corporation every writing of whatever nature issued by an agent of the corporation. If every such writing were deemed to be within the scope of the section there would be included writings made and issued to serve some temporary purpose and which would be destroyed after that purpose had been served.

■■■ American was given receipts by its customers for more drums than it delivered. Acceptance of such a receipt would not be a falsification of American's records. When American issued a receipt to a customer for fewer drums than the customer delivered, this would not be a falsification of Amer-

ican's records. Either transaction would merely furnish the basis for a charge against the customer. If the shortage was of drums delivered by American on a sale to a customer the latter would apparently owe American an excess of money; if drums were delivered to American in excess of the number receipted for the customer would owe American drums. None of these transactions involving shortages was completed at the time the transaction took place. They entered into the matter of accounting and were paid for in settlement of accounts. It is altogether probable that the delivery memoranda were used as a basis for entries in American's books of account since some one in American's office force would have had that duty. But there was no evidence that Blau or Fisher ever made or caused to be made such entries. In the absence of evidence upon that score, we think the verdict and judgment insofar as they adjudged appellants guilty of violation of section 3020, subdivision (b), of the Corporations Code were erroneous.

Error is assigned in the receipt of evidence of events occurring prior to April 13, 1953, the date of the formation of the conspiracy as alleged in the information. ▇▇▇ The testimony referred to is that of Butterfield, who related transactions in which he furnished drums to Blau in 1950 and 1951, during an earlier employment by Andrew Brown Company. Appellants moved to strike this testimony and the motion was denied. It is contended that the evidence was not relevant to the conspiracy charged in the information. The contention is untenable.

▇▇▇ The general rule with respect to proof of a conspiracy is that it is no objection that the evidence covers a great many transactions and extends over a long period of time, that it may show another crime, that the acts, evidence to show which is offered, occurred some time before the alleged formation of the conspiracy, provided, however, that the facts shown have some bearing on and tendency to prove the ultimate fact in issue. (*People* v. *Stevens*, 78 Cal.App. 395, 406 [248 P. 696]; *People* v. *Black*, 45 Cal.App.2d 87, 102 [113 P.2d 746].) ▇▇▇ It was proper to show the relationship of Butterfield and Blau and that they had engaged in the same type of dishonest practices before the formation of the conspiracy alleged in the information. In weighing the probabilities with respect to the existence of an unlawful agreement between them, it was proper for the jury to take into account evidence that they had previously engaged in similar

practices which they found to be to their mutual advantage. Moreover, all the evidence with respect to the activities of Blau, Fisher, Mays and Meceirow in the transactions in evidence would have demonstrated that if Blau and Fisher were innocent, Mays and Meceirow alone were guilty of conspiring with the agents of American's customers. One contention seriously urged by appellants is that even if a conspiracy existed they had no part in it. But Mays was not employed by Blau in the handling of drums in 1950 and 1951 and for that additional reason evidence of Blau's earlier transactions with Butterfield was relevant.

Each appellant made motions to strike all evidence of statements and occurrences outside his presence, and the motions were denied. This was not error. ■ It is elementary that after proof of a conspiracy evidence of the declarations of any of the conspirators and their acts within the scope of the conspiracy is admissible against all, including those who were not present at the occurrences. (*People* v. *Cook*, 10 Cal.App.2d 54 [51 P.2d 169]; *People* v. *Correa*, 44 Cal. App. 634 [186 P. 1055]; *People* v. *Mazzurco*, 49 Cal.App. 275 [193 P. 164].)

Appellants made motions to strike evidence as to searches made of the records of the various corporate customers and testimony that delivery slips in addition to those produced could not be found, and also to strike certain exhibits evidencing deliveries relating to the transactions in issue. The evidence was relevant to the issues and was properly admitted. It was not error to deny the motions.

A Mrs. Littke, a juror in the first trial in which, pursuant to stipulation, a mistrial was declared, testified on behalf of the People that while the former trial was under way she was patronizing the cafeteria of appellants; Fisher said in her hearing that he intended to take the jurors to dinner after the trial and Blau said he hoped the jurors would see it his way and that it would be to the jurors' advantage if they did. It is contended that this evidence was improperly received over objection and that the statement of the prosecutor in his opening statement that he intended to produce such evidence constituted misconduct. The claims of error and misconduct are unfounded. The statements, if made by appellants, tended to show a consciousness of guilt and under well-settled rules the evidence was admissible. ■ Efforts of the defendant to suppress or fabricate evidence or to wrongfully influence or intimidate witnesses may be given in evidence as tending

to prove a consciousness of guilt. (22 C.J.S., p. 966, § 633; *Clark* v. *Tulare Lake Dredging Co.,* 14 Cal.App. 414, 437 [112 P. 564]; *Silva* v. *Northern Calif. Power Co.,* 32 Cal.App. 139, 146 [164 P. 412]; *Ross* v. *San Francisco-Oakland T. R. Co.,* 47 Cal.App. 753, 767 [191 P. 703].) ▮ Attempts to influence jurors are in the same category.

The record shows that appellants had entered a purported but inadequate plea of former jeopardy. It was stated in the minutes "Each defendant enters an additional plea of 'Not Guilty having once been in jeopardy.' " During the course of the trial they sought leave to amend their plea so as to state the title of the court and cause, and the time and circumstances of a waiver of jury trial to which the amended plea would relate, and they relied upon a transcript of the proceedings of July 27, 1954 in support of their motion. Their motion to amend was denied. The proceedings relied upon by appellants related to the proposed submission of the cause upon a transcript of the evidence at the preliminary. The reporter's transcript discloses that on July 27 in Department 44 before Judge Schweitzer it was stated by the court that the cause was to be tried in Department 42 (Judge Walker) and the court understood that the parties intended to submit it upon the preliminary transcript without further evidence. The attorneys stated that it would be so submitted, whereupon the court ordered the cause assigned to Department 42 on August 3 for further proceedings and the parties were ordered to appear at that time. Judge Walker could not try the case and it was retransferred to Department 44, Judge Nye, for resetting. The People made a motion for vacation of the waiver of trial by jury and the tentative stipulation that the cause be submitted on the preliminary transcript. There was no objection by appellants and the motion of the People was granted. The cause was then assigned to Department 46, Judge Crum.

▮ Where the trial is to a jury jeopardy attaches when the jury has been impaneled and sworn. (*People* v. *Hawkins,* 127 Cal. 372 [59 P. 697]; *In re Harron,* 191 Cal. 457 [217 P. 728]; *People* v. *Young,* 100 Cal.App. 18 [279 P. 824]; *Jackson* v. *Superior Court,* 10 Cal.2d 350 [74 P.2d 243, 113 A.L.R. 1422].)

At the time of the waiver of jury trial when the court was told by counsel the cause would be submitted on the preliminary transcript, there was a further stipulation that each side reserved the right to move to strike any of the evidence.

In seeking leave to amend their plea appellants offered a transcript of the proceedings which we have thus summarized. There was no showing that appellants had formerly been placed in jeopardy. The proceedings on July 27 in the department of the presiding judge of the criminal departments were preliminary to the designation of a trial department. Appellants were not placed on trial in Department 44 either before Judge Schweitzer or Judge Nye, nor in Department 42 before Judge Walker. The cause was not submitted to any of those judges nor was a trial commenced in any manner at any time before the trial to a jury was commenced in the department of Judge Crum.

■■■ Where it is proposed that a cause will be submitted upon the evidence adduced at the preliminary without additional evidence, jeopardy does not attach prior to the commencement of the trial. This is all we are called upon to decide. ■■■ Inasmuch as there was insufficient proof of former jeopardy as shown by the record offered in support of the motion to amend, there was no error in denying the motion.

It is contended that the court was required to render a decision upon the plea of former jeopardy and failed to do so. The plea of once in jeopardy must be oral, entered in the minutes and in substantially the following form: "The defendant pleads that he has been once in jeopardy for the offense charged" (specifying the time, place and court). (Pen. Code, § 1017.) The purported plea was defective in that it failed to state the time, place and the court. ■■■ In discussing the merits of the plea of former jeopardy, the court said: "Then, we come down to a point that up to this present time, as a matter of law, there is no plea of once in jeopardy before the court." We think this was a sufficient determination that the defense of former jeopardy as pleaded was insufficient as a matter of law. The plea was insufficient, and the ruling to that effect was all the decision the court was required to make. ■■■ The plea being insufficient in form and obviously unfounded upon the admitted facts, and the amendment having been properly denied, mere informality in the form of the court's ruling and the absence of an express finding would not be an irregularity which would justify a reversal and a retrial of the cause.

Several errors are assigned in the receipt and exclusion of evidence. These do not justify particular discussion. The

testimony in question was inconsequential. We are satisfied that the rulings were neither erroneous nor in any respect prejudicial to the appellants.

A point is made of the fact that Forbes was permitted to testify as to the telephone conversations he overheard between Blau and Waymire and Goddard. It is said that his testimony was improperly admitted under the doctrine of *People* v. *Cahan,* 44 Cal.2d 434 [282 P.2d 905]. The point does not require discussion; appellants could have suffered no prejudice through the testimony of Forbes. The matters to which the conversations related, namely, the delivery of drums and the payment of money, were not in dispute since it was admitted by appellants that they did receive the drums and pay the money.

Appellants requested an instruction to the effect that if the evidence was susceptible of two equally reasonable constructions, the one favoring innocence of the defendants should be adopted. They say that no instruction was given "which in effect covered the same subject matter" and "since there was circumstantial evidence submitted to the jury the court should have instructed the jury which construction to adopt where the evidence was susceptible of different constructions." The People quote an instruction that the court gave, reading: "I instruct you further that you are not permitted, on circumstantial evidence alone, to find a defendant guilty of any crime charged against him unless the proved circumstances not only are consistent with the hypothesis that the defendant is guilty of the crime but are irreconcilable with any other rational conclusion." This is a sufficient answer to the criticism of the court's failure to give appellants' requested instruction.

Appellants requested an instruction, which the court refused, to the effect that private transactions are presumed to be fair and regular (Code Civ. Proc., § 1963, subd. 19) and they assign the refusal as error. In view of the instructions that were given, including those as to the presumption of innocence we cannot see that the refused instruction would have aided appellants. Moreover, they had testified fully with respect to all the transactions in question. The court gave an instruction: ". . . Defendants are presumed to speak the truth; and unless this presumption is destroyed by the evidence in this case your oath requires you to find that they have spoken the truth." In view of the evidence this was

a sufficient instruction. If the jury had believed the explanations of appellants the transactions in which they engaged would have been found to have been fair and regular.

There was no error in instructing to the effect that the testimony of Mrs. Littke was received for consideration only as it might tend to show a consciousness of guilt on the part of the defendants and that the significance of it, if any, was solely a matter for consideration of the jury. Neither was it error to instruct that testimony purporting to relate oral admissions of the defendants should be viewed with caution. While appellants did not make any admissions of guilt, there was evidence of a great number of statements made to their accomplices which, if made, would have been even more potent evidence against them than mere admissions of guilt. Appellants were not harmed by the instruction and it may have been interpreted by the jury as favorable to them.

On their motion for a new trial appellants submitted an affidavit of one of the jurors in which she stated that the verdict was the result of a compromise; some of the jurors who were inclined to vote in favor of Mays' guilt voted for his acquittal when other jurors who were in favor of acquittal of the appellants agreed to vote in favor of the guilt of Blau and Fisher of a lesser offense. It was not error to refuse a new trial on the ground of misconduct of the jury.

Jurors may not impeach their verdict by affidavit that it was the result of compromise, or for other irregularity other than that it was arrived at by chance. (*People* v. *Kromphold,* 172 Cal. 512 [157 P. 599]; *People* v. *Reid,* 195 Cal. 249 [232 P. 457, 36 A.L.R. 1435]; *People* v. *Gidney,* 10 Cal.2d 138 [73 P.2d 1186]; *People* v. *DeVoe,* 123 Cal.App. 233 [11 P.2d 26]; *People* v. *Richards,* 1 Cal.App. 566 [82 P. 691]; *People* v. *Maggio,* 90 Cal.App. 683 [266 P. 813]; *People* v. *Denton,* 22 Cal.App.2d 673 [72 P.2d 191].)

On their motion for new trial appellants presented the affidavit of one of their attorneys by which it was made to appear that appellants were charged with, tried and acquitted of conspiracy to violate section 182, subdivisions 1 and 5, of the Penal Code, based upon a charge that they had attempted to corruptly influence the juror, Mrs. Littke. It was alleged that the trial resulted in an acquittal after the conviction of the appellants in the instant case. The testimony of Mrs. Littke was introduced in the trial of appellants as tending to show a consciousness of guilt on their part; their

acquittal of an attempt to corruptly influence the juror meant only that they were not guilty of that offense, and upon a retrial would not have rendered inadmissible or incompetent the testimony of Mrs. Littke, and most assuredly did not require the court in the exercise of its discretion to grant a new trial. There was no abuse of discretion.

There are no other contentions of the appellants that merit particular discussion.

Although, as we have stated, the charge of conspiracy in Count I of the information was broader than the conspiracy proved, this does not affect the validity of the conviction upon that count and it must be affirmed.

The judgment and order denying motion for new trial are affirmed.

Wood (Parker), J., and Vallée, J., concurred.

On March 28, 1956, the opinion and judgment were modified to read as printed above. A petition for a rehearing was denied April 5, 1956, and appellants' petition for a hearing by the Supreme Court was denied April 18, 1956. Gibson, C. J., did not participate therein.